**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,  )<br>)<br>v.   )  Criminal Case No 1:06-cr-00249-PLF<br>)<br>MICHAEL JOHN O'KEEFE, SR. and  )<br>SUNIL AGRAWAL,   )<br>)<br>Defendants.  ) | |

**SUPPLEMENTAL MEMORANDUM IN
SUPPORT OF SUNIL AGRAWAL'S MOTION TO
COMPEL DISCOVERY UNDER RULE 16(a)(1)(E)**

At the request of the Court, Sunil Agrawal, through counsel, submits this supplemental memorandum in support of his motion to compel discovery from the government. Although counsel for Mr. Agrawal has resolved several discovery issues with the government, a number of issues remain and require judicial resolution.

Mr. Agrawal respectfully requests oral argument on his motion.

**I.   INTRODUCTION**

The Indictment in this case is not overly complex. It charges Mr. Agrawal and his co-defendant, Michael John O'Keefe, with one count of conspiracy and each defendant with one count of bribery.[1] The two bribery counts, which are reciprocal, charge Mr. O'Keefe with accepting and Mr. Agrawal with giving things of value to influence Mr. O'Keefe (the public official) "*in the performance of an official act*, that is, the expedited handling of applications for and issuance of visas to STS Jewels employees in exchange for bribes." *See* Indictment, Counts 2 and 3 (emphasis added).

---

[1] The other two counts of the Indictment, charging aiding and abetting and criminal forfeiture, are not implicated in this discovery dispute.

Paragraph 9 of the Indictment sets forth two distinct objects of the alleged conspiracy. The first object of the alleged conspiracy is described as Mr. O'Keefe's (a public official) acceptance of things of value in exchange for issuing visas to benefit Mr. Agrawal and his business. *Id.* Count 1. The second object of the conspiracy is described as Mr. Agrawal's attempt "to avoid *established procedures* for scheduling visa interview appointments and obtain expedited visa interview appointments and expedited issuance of visas, thereby saving … time and money." *Id*. ¶ 9.B (emphasis added). The conspiracy count also alleges that Mr. O'Keefe "had a *duty to refrain* from accepting things of value from persons with an interest in the issuance of visas by him, as well as a *duty to refrain* from issuing visas to persons that he knew or with whom he had a personal relationship." *Id*. ¶ 5 (emphasis added). The conspiracy count also refers to these duties as Mr. O'Keefe's "lawful duties." *Id*. ¶ 8.

Stated as simply as possible and without elaborating extensively on Mr. Agrawal's trial strategy, the overwhelming bulk of Mr. Agrawal's discovery requests that are still at issue were intended to require the government to produce documents and other responsive material that evidence or relate to:

1. <u>The visa applications of STS Jewels employees, including requests for expedited visa interview appointments</u>. *See* 12/22/06 Ltr. from T. Green to AUSA Johnson, Request 3(b) ("12/22/06 Ltr."). The indictment alleges that one object of the conspiracy was the giving of things of value to Mr. O'Keefe in exchange for his issuing visas to benefit Mr. Agrawal and his business. One approach to contesting this allegation is to demonstrate that Mr. Agrawal's employees who received visas were eligible to receive those visas because other government agencies unconnected to Mr. O'Keefe, including the U.S. Department of Citizenship and Immigration Services, had previously found them eligible to work in the United States under

a non-immigrant status (*e.g.*, H-1B).[2] Moreover, these documents will show that Mr. Agrawal's employees were not afforded special treatment in the adjudication of their visa applications. The documents requested under this category are therefore clearly material to the preparation of Mr. Agrawal's defense.

Mr. Agrawal's request for documents pertaining to the denial of visas to STS Jewels employees should also be granted. Such documents support the contention that it is illogical for Mr. Agrawal to have bribed Mr. O'Keefe to expedite perfunctory appointments while making no effort to have the actual denials of visas reversed (which Mr. O'Keefe had authority to do).

2. <u>The handling of expedited visa interview appointments in the U.S. consulate in Toronto and other U.S. consulates in Canada and Mexico</u>. *See* 12/22/06 Ltr., Requests 3(d)-(g); 1/5/07 Ltr. from T. Green to AUSA Johnson, Requests 1(a)-(c) ("1/5/07 Ltr."). The Indictment states that there are "established procedures" for scheduling visa interview appointments. In short, Mr. Agrawal's requests seek to shed light on those "established procedures," if they exist. Specifically, the government contends that Mr. O'Keefe

---

[2] Authorization to work in the United States under H-1B non-immigrant status involves two separate processes: (1) H-1B classification, adjudicated by CIS, and (2) issuance of the H-1B visa, or visa stamp, issued at a consular post abroad. Upon favorable review of the petition for H-1B classification, CIS issues an H-1B approval notice (Form I-797) that makes the employee eligible to work for the U.S. petitioner company.

The Department of State H-1B visa stamp that is placed in an employee's passport is not required for work *per se*. Instead, the H-1B visa stamp is simply a travel document that the foreign national must present for admission into the United States, whether that person is entering the United States for the first time or after traveling abroad. Although an employee's H-1B status may be valid for several years, his or her H-1B visa may be valid for a shorter period. Most foreign nationals need a valid, unexpired H-1B visa every time they seek to enter the United States in H-1B status. Thus, an employee with an expired visa will have to secure a new H-1B visa if that employee intends to leave the United States and then re-enter. However, when an H-1B visa expires, it does not affect the foreign national's ability to work in the United States.

CIS approval of H-1B status is *prima facie* evidence of approvability for a visa. A consular officer does not have any basis to refuse issuance of a visa if the applicant (1) has an approved H-1B petition from CIS (Form I-797); (2) is not subject to any grounds of inadmissibility, including criminal convictions, health issues, security problems, or past immigration violations; and (3) has presented all necessary forms and documentation for the visa.

afforded Mr. Agrawal's employees special or impermissible treatment by granting expedited visa interview appointments. The government has agreed to search for and produce all written rules, policies, procedures, and guidelines regarding expedited appointments at the posts in Canada and Mexico. However, the probable absence of such materials makes it critical that Mr. Agrawal be permitted to discover any underlying documents (requests, responses, etc.) that reflect the actual processing and resolution of requests for expedited appointments in Toronto and in Mexico.[3] *See* 12/22/06 Ltr., Requests 3(d)-(f); 1/5/07 Ltr., Requests 1(a)-(c). The need for these documents is further justified because the State Department and the various consulates do not track information "on how many expedited requests a given post received, approved, or processed." *See* Gov't Opp. to Def.'s Mot. to Compel, at 3-4 ("Gov't Opp."); *see also* Fed. R. Evid. 1006 ("The contents of voluminous writings … may be presented in the form of a chart [or] summary…."). Importantly, the government does not deny that responsive documents exist. *See* Gov't Opp. at 15.

        These documents are material to the preparation of the defense because of the substantial likelihood that they will demonstrate that the requests made on behalf of Mr. Agrawal's employees are similar, if not identical, to other requests which were routinely granted without the provision of any thing of value. The documents will also establish that the Toronto consulate processed and approved many expedited interview appointment requests and that a large percentage of such requests came from celebrities, entertainers, and other individuals who were afforded "special treatment" without having to bribe any public official.[4] Lastly, these

---

[3] Mr. Agrawal's employees could have applied to any of these posts under the State Department's third-country visa processing program.

[4] Mr. Agrawal's request for "memorabilia" received by consular employees in connection with expedited visa appointments of celebrities will further demonstrate the actual practices of the Toronto consulate. This request is
(continued)

documents will also show that requests to expedite appointments were processed and granted by local non-U.S. employees who were not consular officials. As a result, the requested discovery will demonstrate that scheduling visa interview appointments did not involve any "official act."[5]

    3. <u>The identity of corporations, companies and/or individuals who were granted expedited appointments at embassies or consulates in Canada and Mexico</u>. *See* 12/22/06 Ltr., Request 3(f). In addition to the reasons set forth in point two, this information is material to the preparation of Mr. Agrawal's defense with respect to identifying possible witnesses, and more importantly, to demonstrate that expedited appointments were made available to a large universe of applicants essentially upon request and without any need to bribe a public official.

    4. <u>Non-classified documents related to the State Department's 2001-2002 investigation of the tanzanite industry</u>. *See* 1/5/07 Ltr., Request 1(d). Mr. Agrawal's request will establish the significant circumstances surrounding the genesis of Mr. Agrawal's friendship with Mr. O'Keefe.[6] In particular, the requested documents will (1) show the extreme reputational and financial peril facing Mr. Agrawal's and other jewelry manufacturers' businesses at the time, and

---

also highly material for cross-examination of Mr. O'Keefe's former supervisor and other consular employees that will likely testify.

[5] The specific email addresses and search terms suggested by the defense are merely intended to focus rather than broaden the inquiry. In an attempt to resolve this dispute without Court intervention, defense counsel proposed (and still proposes) to limit these requests which asked for information from fourteen (14) posts in Mexico and Canada to six (6) specific posts (Ottawa, Canada; Toronto, Canada; Matamoros, Mexico; Mexico City, Mexico; Nogales, Mexico; and Nuevo Laredo, Mexico). *See* 12/22/06 Ltr., Requests 3(f); 1/5/07 Ltr., Requests 1(a)-(b).

[6] In 2001, the Wall Street Journal published an article alleging that Muslim extremists loyal to Osama bin Laden used the tanzanite trade to smuggle gems out of Tanzania in order to finance terrorist activities and launder money. *See Bought, Sold by Militants Near Mine, Tanzanite Ends Up at Mideast Souks*, WALL STREET JOURNAL (November 16, 2001). The article led to a boycott of tanzanite by U.S. retailers, which negatively affected Mr. Agrawal's and other jewelry manufacturers' businesses. In early 2002, the State Department finished its own independent investigation of the allegations and concluded that there was no evidence of a present link between the tanzanite industry and the September 11th Attacks. As the State Department's Desk Officer for Tanzania, Mr. O'Keefe announced the results of the investigation at an industry summit also attended by Mr. Agrawal. The State Department's pronouncement initiated the lifting of the boycott and may have literally saved Mr. Agrawal's business.

(2) contextualize Mr. Agrawal's long time respect for and friendship with Mr. O'Keefe, who as the State Department's spokesman, unknowingly acted as a savior to Mr. Agrawal's business.

## II. THE GOVERNMENT'S FAILURE TO PROVIDE DISCOVERY MATERIAL TO MR. AGRAWAL'S DEFENSE

As set forth in detail in Exhibit 1, the government has wholly failed to produce any discovery responsive to the core of Mr. Agrawal's requests—*documents and information evidencing consular practices and processes with respect to expedited visa interview appointments*. *See* 12/22/06 Ltr., Requests 3(b), (d)-(g); 1/5/07 Ltr., Requests (1)(a)-(c). The government does not deny that responsive discovery exists. *See* Gov't Opp. at 15. It simply asserts that responsive discovery may or may not exist for *every* expedited visa appointment request ever made. *See* 1/23/07 Ltr. from AUSA Johnson to T. Green, at 6-10 ("1/23/07 Ltr."). For the reasons set forth in the Memorandum of Law in Support of Mr. Agrawal's Motion to Compel Discovery Under Rule 16(a)(1)(E) ("Memorandum") and the reasons set forth in this Supplemental Memorandum, Mr. Agrawal's discovery requests are clearly material to his defense. *See United States* v. *Safavian*, 233 F.R.D. 12, (D.D.C. 2005) ("Rule 16… provide[s] … 'the widest possible opportunity to inspect and receive such materials … as may aid [a defendant] in presenting his side of the case.'") (internal citations omitted).

Despite defense counsel's attempt to negotiate and resolve this discovery dispute, the prosecution still objects to the core of Mr. Agrawal's discovery requests. In essence, the government wants to prove that "scheduling" or "rescheduling" a visa interview appointment is an "official act," and that Mr. Agrawal had an intent to bribe Mr. O'Keefe in the performance of

6

that act. At the same time the government wants to withhold evidence that would contradict those propositions.[7]

At bottom, the government's objections to production of the requested materials are based on arguments of immateriality and undue burden. *See generally* Gov't Opp. to Def.'s Mot. to Compel. Mr. Agrawal has set forth extensive justifications for the materiality of the requested information in his Memorandum and in this Supplemental Memorandum. Likewise, the government's arguments regarding the burden associated with Mr. Agrawal's requests cannot relieve the government of its obligations to produce documents that are material to the defense. *See* Def.'s Memo. at 17.[8]

Moreover, additional responsive material may be located through efficient hardcopy searches, *see* Def.'s Mem., at 12 n.6, and through electronic searches of Mr. Schimmel's computer and emails, *see* 1/23/07 Ltr. at 4 ("Mr. Schimmel would decide whether the case should be moved forward in the queue"), as well as through searching other electronic

---

[7] The government strongly resists Mr. Agrawal's attempt to shed light on the treatment of requests for expedited visa interview appointments at the Toronto consulate and other locations to which Mr. Agrawal's employees could have applied. Indeed, the government appears to assert that the only relevant evidence in this case are the communications and interactions between Mr. Agrawal and Mr. O'Keefe. The government also appears so bold as to assert that the Court should restrict all evidence to that which bears on the "intent" of each defendant. *See* Gov't Opp. at 16. However, the government has virtually no direct evidence of Mr. Agrawal's intent and has to-date ignored pursuing all exculpatory evidence demonstrating the pre-existing relationship of friendship and respect between the defendants. In reality, the government will have to heavily rely on circumstantial evidence of intent to prove the charges against Mr. Agrawal. If circumstantial evidence is good enough for the government, it is clearly good enough for the defense under the reasonable doubt standard. *See Libby*, 429 F. Supp. 2d at 11-16 (evidence negating or undermining the specific intent required by a criminal offense is material to the defense); *see also United States v. Poindexter*, 727 F. Supp. 1470, 1475 (D.D.C. 1989).

[8] As explained in the Memorandum, the burden on the government is not relevant under Rule 16. *See* Def.'s Memo. at 17. The government ignores this issue in its Opposition, relying on its immateriality arguments. Nevertheless, although the government avoids the term "burden" in its Opposition, it is clear that burden is a fundamental basis for its objections. *See* Gov't Opp. at 9 ("The vast scope and breadth of the requests suggest that Defendant Agrawal is attempting to engage in a large scale fishing expedition."); *id.* at 12-13 ("mammoth electronic search"); *id.* at 14 ("a search would be extremely time consuming, labor intensive, and prohibitively expensive"); *id.* at 15 ("the logistics of such an endeavor …"). These are not valid reasons for failure to produce material discovery. *See, e.g., United States v. Libby*, 429 F. Supp. 2d 1, 11-16 (D.D.C. 2006) (court required review and production or summarization of a large volume of "the most highly classified documents generated by the government.")

accounts that are likely to contain information regarding expedited visa interview appointment processing.[9]

Finally, the government's secondary concerns of "confidentiality and security" are red herrings. Even prior to Mr. Agrawal's formal requests, the government produced discovery concerning expedited appointments (from Mr. O'Keefe's email communications) without raising such concerns. Moreover, as discussed in Mr. Agrawal's Memorandum, Section 222(f) of the Immigration and Nationality Act (the section relied upon by the government in connection with its confidentiality objection) is limited in scope, and regardless, the Court has the authority to order production under that statute. *See* Def.'s Mem. at 18.

---

[9] The government raises a number of "logistical" (to these searches) concerns in its Opposition. They are easily resolved. *First*, Trister, Dingle, Green, and Spiegel are surnames of attorneys that, upon information and belief, regularly requested expedited appointments at Canadian posts. Their names appear regularly on communications to Mr. Schimmel or Mr. O'Keefe in the discovery produced to-date, and are therefore relevant. *See* Gov't Opp. at 13. *Second*, we are not asking the government to reconstruct back-up tapes. *See id*. at 14. Documents collected from Mr. O'Keefe's computer and produced to the defense had numerous emails older than six months (the purported retention period). Email retention policies are often not regarded and/or are often superseded by an individual user's archiving and record-keeping practices. *Third*, the government has stated that it uses "specialized computer software (Encase and FTK)" to analyze computer data. *See* 1/23/07 Ltr., at 2. Contrary to the government's assertions, these two programs have the capability of using wildcard characters and running proximity searches. *Id*. at 14. For example, FTK or "Forensic Tool Kit" uses the dtSearch engine that is capable of performing these types of searches. *See* http://www.accessdata.com/media/en_us/print/techdocs/techdoc.dtSearch_Requests.en_us.pdf (last visited February 19, 2007). *Fourth*, the government asserts that the proposed search terms will yield volumes of ultimately non-responsive information. *See* Gov't Opp. at 14. The government is welcome to offer additional input on how to reasonably limit the search terms. Regardless, the universe of documents culled by the search terms is no doubt smaller (for review purposes) than the alternative. *Fifth*, the hardcopy searches should not pose the difficulties the government suggests. *Id*. at 15. The government readily located responsive documents concerning STS Jewels employees. Moreover, review of these files is dramatically assisted by the consulate's pre-flagging of the materials with *blue* approval notices. *See* Def.'s Mem. at 17 n.6 & Ex. 6. *Sixth*, the government's ability to readily identify with precision 82 visa applications undermines its claims of the "onerousness" of locating these documents. *See* Gov't Opp. at 17 n.17.

### III. CONCLUSION

For the foregoing reasons, and the reasons set forth in the Memorandum of Law in Support of Mr. Agrawal's Motion to Compel Discovery Under Rule 16(a)(1)(E), Mr. Agrawal respectfully requests that the Court grant his Motion to Compel. The attached order sets forth Mr. Agrawal's proposals for requiring the government to respond to his discovery requests.

Dated: February 21, 2007                    Respectfully submitted

_____/s/_____
Thomas C. Green (D.C. Bar #14998)
Mark D. Hopson (D.C. Bar #394338)
Juan P. Morillo (D.C. Bar #475196)
David J. Ludlow (D.C. Bar #489136)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202-736-8000