IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | Criminal Case No 1:06-cr-00249-PLF/JMF |
| MICHAEL JOHN O'KEEFE, SR. and SUNIL AGRAWAL, | ) ) ) ) | |
| Defendants. | ) | |

**REPLY TO GOVERNMENT'S OPPOSITION
TO DEFENDANTS' SECOND MOTION TO COMPEL**

There is no question that if the roles were reversed in this case the government would be at least making noises about "obstruction of justice" given the haphazard manner in which the documentary evidence was retained, collected, and produced. The Opposition makes clear that the prosecution has absolutely no idea which files were searched—or ignored— without "essentially redo[ing] much of the search process." *See* Gov't Opp. at 4. The Department of Justice ("Department" of "DOJ") essentially abdicated its discovery obligations in this criminal case.

From the outset, the prosecution has taken the position that the Court-ordered discovery of the expedited visa interview appointment policies and practices is "meaningless and a waste of everyone's time including the court." *See* Gov't Motion for a Status H'rg, at 3 n.3 [Docket No. 53]. Despite two Court orders mandating such discovery, the government has unabashedly continued to insist that the documents in question are unnecessary and irrelevant. *See, e.g.*, *id.* at 2 n.1 ("The government believes after the court views the actual documents … [it] will … restrict the disclosure as having no relevance …"). For example, at the September 12,

2007 hearing before Judge Facciola, the prosecution repeatedly challenged the materiality holding in the Court's April 27 Order. *See, e.g.*, Hr'g Tr. at 18-28 (Sept. 12, 2007).[1]

The systematic and continuous opposition to a Court order that the government characterizes as a "waste of time" may indicate why little was done to ensure that the consulates' response to the order was meaningful. It appears that the prosecutors simply provided information about the scope of the documents sought, and left it to untrained personnel in the consulates to decide which files should be searched and which documents should be produced. The documents that were collected through this haphazard process were then transmitted in an equally random manner that made no effort to track the original source or location of the documents.

Defendants' motion to compel pointed to a number of areas in which the production has been proven to be incomplete. We specifically noted the apparent gaps in the production of electronic documents. *See* Defs.' Mem. at 7-10. The Opposition does not meaningfully respond to these criticisms. In fact, the government's Opposition—and its

---

[1] THE MAGISTRATE JUDGE: So you're going to say, to be consistent, that when you rest and the defense begins to present evidence that tends to [undercut the inference of a *quid pro quo*], your going to object to the materiality of that testimony before Judge Friedman?

MS. CHEUNG: Yes, Your Honor…. [W]e don't feel that that is at all relevant to the charges and we would move in limine to prevent them from making those type of arguments. Because, for instance, what I think the defense would like to do is to get one of these individuals up there, "Did you not grant an expedited interview to a corporate or a celebrity figure on such and such date? "Yes, I did." What does that prove and how does that go to whether or not Mr. O'Keefe both scheduled an expedited interview for one of Mr. Agrawal's employees ….

THE MAGISTRATE JUDGE: . . . . [I]t would purport to negate the notion that [what] he was doing was out of the ordinary. If it is ordinary, then the jury can deduce that since it was ordinary they may not deduce therefrom that it was done with an evil intention. If the same thing is done for everyone, and what these gentlemen did is not exceptional, they're not guilty. Isn't that true?
….
[Y]ou're taking on upon yourself the definition of materiality that is peculiarly within the responsibility of the defense to shape at trial. Doesn't that trouble you? You're the prosecutor. What they think is material to their defense is within their definition. If that's not true, what does the 6th Amendment mean in terms of subpoenaing a witness and having the effective assistance of counsel? …. You may not like the way the way they're going about to prove the materiality of something, but I shudder to think that … you can define what the defense is….

Hr'g Tr. at 20-21 (Sept 12, 2007).

apparent inability to address the reasonableness of its response to this Court's order—only confirms the need for the information sought by the motion to compel.

**I.  THE PROSECUTION HAS NOT ESTABLISHED REASONABLE, GOOD FAITH EFFORTS TO RESPOND TO THE COURT'S ORDER**

The government relies principally on the declaration of Peggy Petrovich to prove that the Toronto consulate undertook "substantial efforts" to search for responsive material. Gov't Opp. at 6 n.3. The declaration does not come close to making the necessary showing.

*First*, the government admits that it never tried to find out "how often or to what extent a consular employee may have either communicated over electronic means or created any document regarding expedited interviews." *Id*. at 6. "Knowing" which custodians are reasonably likely to have responsive documents and how they use and store such documents is an essential step in a document collection. *See, e.g.*, *Zubulake*, 229 F.R.D. at 432 (the government should "communicat[e] with the 'key players' … in order to understand how they stored information"); *United States* v. *Naegele*, 468 F. Supp. 2d 150, 154 (D.D.C. 2007) (holding that a search is inadequate if it does not cover each "reasonably likely source … where the requested information might likely be found….")

*Second*, the declaration discloses that the government used keyword searches without any understanding of the terminology that might be used in relevant and responsive communications. *See* Gov't Opp., Ex. A, ¶ 7. The government chose the narrowest possible set of <u>three</u> keywords: "early or expedite* or appointment."[2] *See id*.; *see also Zubulake*, 229 F.R.D. at 432 (it is advisable for counsel to "create a broad set of search terms … and then segregate responsive documents"); *Naegele*, 468 F. Supp. 2d at 154 (finding a document search inadequate

---

[2] The government also states that it searched using the phrases "early & interview" and "expedite* & interview." *Id*. However, these phrases would not produce any additional documents because these Boolean searches are subsets of "early" and "expedite*"

3

because it was not reasonably calculated to locate all responsive documents). This search would not locate documents that contain terms known to be relevant to this case, including for example, "expediting," "waive," "appt," "interview," "same day service," "same w/2 day," "emergency," "request w/5 appointment," "VIP," "rush," "accelerate," and "urgent." These terms commonly appear in hardcopy discovery provided by the government—indeed, defendants suggested many of the above terms in its original proposed order. *See* Defs.' First Motion to Compel [Docket No. 35].[3]

*Third*, Ms. Petrovich's Declaration provides no indication of what software was used or the mechanics of how the electronic documents were searched or who authored/approved the list of <u>three</u> unique search terms. If forensic software was not used, then there is a strong likelihood that stored email folders (.PST files), attachments, and other electronic files were not searched at all or not accurately. This may explain why the government located <u>no</u> responsive stand-alone electronic documents by using the keyword searches. *See* Gov't Opp., Ex. A, ¶¶ 3, 10 (the only stand-alone electronic documents were from a manual search of electronic files).

*Fourth*, the government has not said anything regarding the document preservation efforts that were undertaken at the time of Indictment or at the time the Court issued its April 27 Order.

*Fifth*, it appears that consulate employees were not even required to search their own files and produce responsive materials in their possession. Self-identification of responsive

---

[3] Moreover, defense review of documents indicates that attorneys representing clients before the consulate would make requests for advanced appointments without using any of the above terms. Had the government made an effort to obtain some knowledge about the consulate processes, it would have known that and used the names of such attorneys and their firms as keyword search terms. It was clearly the sole responsibility of the government to develop reasonably useful terms. See *United States* v. *O'Keefe*, 2007 WL 1239204 *3 n.2 ("The Court will not … micromanage the search process by listing key word search terms that must be used for the government to meet its obligations").

4

documents is a crucial aspect of the collection process. *See United States* v. *Safavian*, 233 F.R.D. 12, 19.

*Sixth,* Ms. Petrovich's Declaration raises many questions about the search for paper or hardcopy documents. It appears that consulate staff only searched the workspace files of four individuals. But the government admits that it searched the personal electronic files of 24 individuals, as well as other shared electronic files. *See* Gov't Opp., Ex. A, ¶¶ 4, 6. Unless there is some reason to believe that 20 individuals (many whose names appear with regularity in the documents produced by the government) had no paper documents, the discrepancy is inexplicable. In addition, Ms. Petrovich admits that the consulate did not search "offsite records." *Id.*, Ex. A, ¶ 5. The government says that such searches occurred, *id.* at 8, but does not explain how those searches were performed or who performed them. By the government's own calculations of the time devoted, it is apparent that at best the searches were done in a superficial fashion.[4]

*Finally*, Ms. Petrovich's Declaration only concerns the Toronto Consulate. The government has provided no information regarding how the document searches were conducted at the other consulates subject to the Court's April 27 Order.

## II. THE GOVERNMENT MISREPRESENTS THE COURT'S APRIL 27 ORDER AND THE PURPOSE OF THE DISCOVERY LETTER JOINTLY DRAFTED BY THE PARTIES

In its Opposition, the government appears to argue that it is not responsible for any deficiencies in the production because the parties jointly drafted a "letter that would inform

---

[4] The government has repeatedly stated that it would need to physically search approximately 199,000 hardcopy visa files as part of the document search in Toronto (in addition to all the other relevant documents sources that exist). *See* Opp. to Motion to Compel (Feb. 9, 2007) [Docket No. 39]. Thus, even factoring in the additional 70 hours the government stated it took to review the archived files, *see* Gov't Opp. at 5, the government would have had to review the visa files at a rate of 14.4 per minute (199,000 / 230 hours / 60 minutes). This leaves no time for copying, and no time to conduct any of the other electronic or other searches the government states that it did so thoroughly.

5

the consulates subject to the Order of their search and production obligations." Gov't Opp. at 2-3. This misrepresents the Court's Order and the discovery letter that was drafted by the parties. Specifically, the Court's April 27 Order provided that:

> The *prosecutors* in this case must craft a letter to the relevant personnel at the consulates identified herein *that instructs them to conduct a thorough and complete search designed to uncover the required documents.* The relevant time period for determining responsiveness shall be January 1, 2004 through the present. A copy of this Memorandum Opinion and Order must be appended to that letter. To avoid later disputes, the text of the letter and a list of addresses must be provided to the Court and to defense counsel in advance; counsel will have 72 hours to make suggestions and 72 hours after the government responds to those suggestions to interpose objections with the Court. This procedure is required not to create the potential for litigation over details but, rather, to encourage communication, accommodation and consensus in implementing the Court's decision….

*United States* v. *O'Keefe*, 2007 WL 1239204 *4 (D.D.C. April 27, 2007) (emphasis added). Neither the Court's Order, nor the subsequent discovery letter ever purported to define the details of the search and production protocols the government should use. *See id*. at *3 n.2 ("the Court will not … micromanage the search process"); Gov't Opp., Ex. A. Nor was it intended to create a "safe harbor" that excused the Department from any compliance or follow-up responsibilities once the letter was sent. As a practical matter, defendants had no ability to understand the relevant State Department "data retention architectures" or to "communicat[e] with the 'key players' … in order to understand how they stored information." *Zubulake* v. *UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004). That responsibility rested with the government.

Moreover, the Department's suggestion that it will provide the native electronic files to the defendants as a remedy for their failure to properly search for and produce documents is not reasonable. To date, defendants have spent tens of thousands of dollars and over <u>1800</u> hours reviewing the discovery provided by the government. Even if the government provided native files to the defense, the government has admitted that there is no way to cross reference

6

these files against the Bates numbered documents already produced. Thus, defendants would be forced to re-review the exact same material (albeit in a different format) at great expense.[5]

### III.   THE NEED FOR AND PURPOSE OF THE REQUESTED INFORMATION

The government asserts that it "made a good faith effort to comply with the Court's Order," *see* Gov't Opp. at 1, and that the relief sought by the motion to compel is "unnecessary," *see id*. at 4. But, as set forth below, and in defendant's lead Memorandum, defendants need the requested information for several reasons.

#### A.   Producing Documents As They Are Maintained in the Ordinary Course is Standard Practice and Is Necessary For Identifying the Custodianship of Documents and Providing An Evidentiary Foundation

*First*, understanding where a document came from and who created the document (and/or has knowledge regarding that document) is absolutely essential to a document's admissibility and value as evidence. Thus, all parties in federal court have an obligation to produce documents in the manner which they were kept in the ordinary course. *See* Fed. R. Evid. 803(6); *see also Boca Investerings Partnership* v. *United States*, 128 F. Supp. 2d 16, 20 ("When the proponent of a document cannot point with any degree of certainty to the individual or individuals who generated it or from whom they received the most important information the document contains, there is no reliable basis on which to admit the document and accept it for its truth.").

Requiring the government to disclose information regarding the custodian and source of the documents produced is also fundamental because custodianship is often essential

---

[5] It is not *per se* problematic that the government produced electronic images (PDF or TIF) to the defense instead of native files—as long as the government preserves the original native files and the unaltered metadata associated with those files. If metadata becomes important as evidence regarding particular documents, the defense will request that it be provided by identifying such documents by Bates number. *See, e.g.*, D.C. Bar Ethics Opinion 341 re Use of Metadata (Sept. 2007) ("metadata may be considered probative [tangible] evidence in litigation" and there is a duty to preserve it)  However, simply producing native files does not show that those files were produced in the manner in which they were kept in the ordinary course. That showing must also be made by identifying the custodian and source of the documents produced.

for authentication purposes. *See* Fed. R. Evid. 901(1). Thus, although the "authors and recipients of *various* documents are self-evident," *see* Gov't Opp. at 4 (emphasis added), there are numerous hardcopy documents where that is not the case. For example, there are faxed requests, which were directed to the Non-Immigrant Visa Section (and approved), but it is impossible to tell who was involved in the process. The custodianship and location of such documents will also be relevant for refreshing witnesses' recollections about the expedited visa appointment "procedures" at the various consulates during the relevant time periods.

Additionally, information about the source and location of these documents is necessary to substantively proving the defense contention that the consulates' procedures were *ad hoc*, inconsistent, and unofficial. A central issue for the defense is to demonstrate that expedited appointment requests were primarily coordinated and approved by non-U.S. citizen secretaries at the consulate. Therefore, custodianship (*i.e.*, knowledge) of certain documents by those secretaries is critical to the defense, and is not necessarily ascertainable from "authors and recipients" on a document.[6]

*Second*, every DOJ subpoena *duces tecum* demands that the recipients produce documents in a manner that discloses the custodianship and source of documents. *See, e.g.*, **Ex. 1** (D.D.C. subpoena requiring respondent to "describe all locations searched," produce documents "in the order in which they are found in the Company's files," and provide "an index to the documents produced containing a description of the documents produced and an identification of the person in whose files the documents were found"); **Ex. 2** (S.D.N.Y. subpoena requiring respondent to provide "[a]n index of the documents produced … setting forth

---

[6] For example, its appears that often requests sent to a general email account like "Toronto NIV" or to Michael Schimmel would eventually end up in the hands of consulate secretaries for approval and scheduling. It is therefore important that the defendants know the custodianship and source (*i.e.*, collection point) of the documents produced.

8

the Bates number(s) and a brief description of each document, and the person and location from whom it was obtained").

The Opposition admits that the Department has not produced documents in this case in the manner consistent with its own requirements—*i.e.*, in the manner in which they were kept in the ordinary course. *See, e.g.*, Gov't Opp. at 4, 6 ("identifying each … document by custodian [and] source would result in the posts having to essentially redo much of the search process"); *see also* P. Petrovich Declaration, ¶ 3 (the consulate mixed electronic and hardcopy files for production purposes).[7] In fact, the government has conceded that its productions were made in such a way that it is *impossible for the government* to discern the source or custodian for the documents. *See* Gov't Opp. at 4. The defense should not be impaired because the United States failed to follow the most basic requirements for ensuring a systematic and meaningful document production. *Id*. at 4.[8]

### B. There Is No Basis On Which To Conclude That the Government's Production is Complete In Whole or Part

The inability of the government to identify (1) the locations searched; and (2) the source of the documents produced to date makes it impossible to conclude that the government has systematically and reasonably identified and collected all of the responsive materials. *See* Gov't Opp. at 4. Indeed, even in the Opposition, the government admits to "overlooking" the production of certain responsive documents. *See* Gov't Opp. at 9 n.4; Def's Mem. at 2-3. In

---

[7] To be clear, there are at least two issues with printing electronic documents as described by Ms. Petrovich. *First*, opening and printing these documents without forensic software will alter the metadata, which may be evidentiary in and of itself. *Second*, by mixing electronic and hardcopy files in its production, the government left defendants with no good way to determine the custodianship of, access to, knowledge of, or authorship of these documents. *Even the government cannot identify the source of documents in its productions*. *See* Gov't Opp. at 4, 6. In fact, during a telephone conversation with the government in which defendants requested a production chart, the government could not even assure defendants that documents collected from specific custodians and sources were produced in identifiable Bates ranges, rather than randomly interspersed throughout the productions.

[8] In addition to the relief sought in defendants' motion, defendants respectfully request that the Court order the government to provide defendants with certifications under Federal Rules of Evidence 901(4) and 901(11) so that the documents produced will be self-authenticating at trial.

short, the Court has no way to evaluate the reasonableness of the process unless and until the government discloses (1) what has been produced (*i.e.*, custodian/source) and (2) specifically where and how the government searched for materials responsive to the Court's April 27 Order.

The government argues that it is "unclear why the defendants require this level of detailed information other than for the convenience of having the government provide an index to its entire production, thereby facilitating the defense review process." Gov't Opp. at 4-5. Again, this is precisely what the Department demands in every subpoena it issues. The fact that such information might "facilitat[e] the [document] review process" is hardly a basis for objection. But it is objectionable to permit the government essentially to "shuffle" its document production so that individual documents cannot be traced, reviewed in context, or admitted into evidence. To do so is to make the documents useless by burying the defense in a mountain of unidentified documentation. *See, e.g.*, *United States* v. *Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987).

## IV.  THE LACK OF TRANSPARENCY IN THE GOVERNMENT'S PRODUCTION JUSTIFIES THE MOTION TO COMPEL

The recently adopted Federal e-discovery rules are a direct recognition of the importance of electronic data. These rules—like DOJ standard subpoena *duces tecum* instructions—are based upon a presumption that litigants do not need to "prove" the relevance of individual documents or the need for uniform, comprehensive electronic data production. The government's Opposition here argues that the defendants are engaged in "unsubstantiated speculation" and have "no foundation" for asserting that there are "production gaps." *See* Gov't Opp. at 4, 6-8. There is no question that the defense has less than perfect information about the flaws in the production. That is the reason for the motion to compel.

But the Opposition confirms that the prosecution largely has abdicated its obligations. Rather than describe and defend its document collection, the government attempts to throw more smoke in the air about what really happened here[9]—making conclusory and abstract statements like:

- "The government has provided responsive information in compliance with the Court's [Order]." *Id*. at 4.

- "The government has labored to appropriately respond." *Id*.

- "The Department of State devoted an enormous amount of resources." *Id*.

- Defendants' production gaps claims could potentially be explained by "differing record retention practices." *Id*. at 5.

- "[H]ow often or to what extent a consular employee may have … [responsive documents] is *unknown* and inevitably varies." *Id*. at 6 (emphasis added).

- "[T]o the extent that technically responsive electronic data … was deleted at some point before the electronic server retention period at a given post, such information cannot be retrieved." *Id*. at 7.

- "The Embassy … engaged in a comprehensive search." *Id*.

- "[T]here *could be* multiple reasons, none of which are relevant to the fact that the searches were conducted…." *Id*. at 8 (emphasis added).

Although the above statements are only examples, they illustrate that the government is not defending the consulates' searches; it is putting forth *ipse dixit* assertions and meaningless truisms. Defendants' motion simply seeks information regarding the consulates'

---

[9] The prosecution suggests that its search was thorough because "the Toronto consulate spent more than 160 hours conducting searches and preparing copies of materials." This work was done from May 7 through May 31, 2007 by "a team of five Consular staff" plus "Information Management staff." *See* P. Petrovich Declaration, Gov't Opp., Ex. A. *First*, 160 hours is less time than the defense has spent trying to piece together and figure out where the documents came from. *Second*, a large amount of this 160 hours was likely devoted to "copying" the documents rather than searching. *See id*. Based on the number of custodians identified by the government, the government could not have done a thorough search, review, and production of electronic documents <u>and</u> paper documents in such a short amount of time. *See supra* note 4. For these reasons, during repeated telephone conversations with the government during the July time frame, defense counsel expressed its doubt that document productions could be completed by August 1, 2007 and told the government to take whatever time it needed to respond properly. Nevertheless, the government insisted on rushing documents out the door in order to be "timely" with respect to the self-imposed August 1, 2007 deadline.

11

search efforts to make the documents produced admissible and to evaluate, in a concrete way, the extent to which the production is complete or even "reasonable." Defendants' requests are reasonable and fully comport with this Court's precedent. *See, e.g.*, *United States* v. *Safavian*, 233 F.R.D. 12, 21 (ordering the government to provide information as to "what specific efforts were made to search for responsive documents").

## V.  CONCLUSION

For the foregoing reasons, and the reasons in their original Memorandum, defendants respectfully request the Court grant their Second Motion to Compel.

Dated: November 2, 2007               Respectfully submitted,


_____/s/_____
Thomas C. Green (D.C. Bar #14998)
Mark D. Hopson (D.C. Bar #394338)
David J. Ludlow (D.C. Bar #489136)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
*Counsel for Defendant Sunil Agrawal*


_____/s/_____
Bernard S. Grimm
LAW OFFICES OF BERNARD S. GRIMM
503 D Street, NW
Suite 250
Washington, DC 20001
(202) 371-0300
(202) 986-5475 (fax)
*Counsel for Defendant Michael John O'Keefe*

12