UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.  Cr. No. 06-249 (PLF/JMF)

MICHAEL JOHN O'KEEFE, SR.,
SUNIL AGRAWAL,

Defendants.

MEMORANDUM OPINION

The indictment charges that the defendant, Michael John O'Keefe, Sr., when employed by the Department of State in Canada, received, *quid pro quo*, gifts and other benefits from his co-defendant, Sunil Agrawal, for expediting visa requests for employees of Agrawal's company, STS Jewels.

By his Order of April 27, 2007, Judge Friedman required the government to conduct a thorough and complete search of both its hard copy and electronic files in "a good faith effort to uncover all responsive information in its 'possession custody or control.'" United States v. O'Keefe, No. 06-CR-0249, 2007 WL 1239204, at *3 (D.D.C. April 27, 2007) (quoting Fed. R. Crim. P. 16(a)(1)(E)).

The first category of "responsive information," as defined by Judge Friedman, was "requests respecting visa applications submitted by or on behalf of STS Jewels employees—including requests for expedited visa interview appointments, decisions granting or denying such interview requests, and the grant or denial of the visas themselves." Id. at *3. This search was to be of the files of the consulates in 1) Toronto,

Canada, 2) Ottawa, Canada, 3) Matamoros, Mexico, 4) Mexico City, Mexico, 5) Nogales, Mexico, and 6) Nuevo Laredo, Mexico. Id.

The second category of "responsive information" was "all written rules, policies, procedures and guidelines regarding the treatment of expedited visa application appointments and visa application approvals at the above-mentioned posts in Canada and Mexico." Id. The government was also required to "produce any memoranda, letters, e-mails, faxes and other correspondence prepared or received by any consular officers at these posts that reflect either policy or decisions in specific cases with respect to expediting" visa applications. Id.

As to the latter, Judge Friedman emphasized his expected scope of the search and the necessity for it. He stated:

> [I]t now appears from discovery produced on March 21, 2007 that employees below the level of consular officers-including even consulate secretaries and non-U.S. citizen employees-may approve requests for and schedule expedited visa interview appointments. The files of any such persons and the consulates themselves therefore also must be searched. Such communications go directly to the defense of showing that the requests made by or on behalf of STS employees are similar to other requests for expedited visa interview appointments that (it is asserted) have routinely been granted without the provision of anything of value.

Id.

Defendants, who have received the government's submission in compliance with this Order, have moved to compel, protesting that the government has not fulfilled the responsibilities Judge Friedman imposed. Memorandum in Support of Defendants' Joint Motion to Compel ("Deft. Memo") at 1.

2

I.  Detailed Information About the Government's Searches

First, for each location searched, defendants demand a comprehensive description of all of the sources that were searched (both paper and electronic), how each source was searched, and who conducted the search. Deft. Memo at 6 and Proposed Order.

In its opposition, the government produced the declaration of Peggy L. Petrovich, the Visa Unit Chief at the United States Consulate General in Toronto, Canada. According to Ms. Petrovich, she, along with her five-member staff, did the following in her effort to comply with Judge Friedman's April 27, 2007, Order:

A.  Paper Record Files

1.  She[1] searched "archived hard copies of all Standard Operating Procedures ("SOPs") to locate Expedited Appointments SOPs dating back to January 2004 that no longer existed in the electronic database." Government's Opposition to Defendants' Joint Motion to Compel Discovery ("Gov.'s Opp.") at Attachment B, page 2.

2.  She searched "archived paper correspondence files to locate expedited appointment requests received via facsimile, correspondence, or electronic mail (email) and the corresponding responses attached to those requests." Id.

3.  She searched "hard copy general and chronological files for any other stand-alone documents responsive to the Order." Id.

4.  The "search for SOPs yielded archived expedited appointment SOPs covering the period between 2003 through May, 2007." Id. She provided hard copies produced from the electronic sources so that everything she produced to defendants was in the same paper format. Id. "The documents printed from the electronic

---

[1] When I use the word "she" I mean Ms. Petrovich and her five-member staff who helped her conduct the search.

3

files contain document footers that identify where in the electronic database a document is stored so that it can be located easily." Id.

5. She conducted a "search of the paper correspondence files, the usual and customary storage location for expedited appointment requests, maintained in three separate five-drawer filing cabinets." Id. This "yielded four drawers with records of expedited appointment requests dating from January 2006 to May 31, 2007." Id. at 2-3. She also searched her own work space and the work spaces of Pat Haye, Jane Boyd, and Althea Brathwaite. Id. at 3.

6. "Prior to January 2006, materials relating to expedited appointment requests were attached directly to the non-immigrant visa applications." Id. After one year, the Toronto consulate sends the hard copies of all non-immigrant visa applications to the Kentucky Consular Center for cataloging. Id. When the search was conducted, "Toronto only retained [ ] the hard copies of non-immigrant visa applications received from May 2006 to May 2007." Id. All other records had already been shipped to Kentucky. Id.

B. Electronic Record Files

1. Search and Yield: She searched all active servers and backup tapes (retained for two weeks) and that search yielded "responsive emails, the SOPs previously mentioned, and the NIV (Non-Immigrant Visa) Schedule Calendar located on Toronto's shared public drive." Id.

2. Parameters of the Search Conducted: "[T]he electronic search included all email and stand-alone electronic documents, e.g., documents prepared on our office software applications, regarding expedited appointments located on shared drives,

personal drives and hard drives for all consular officers and locally-engaged staff, i.e., secretaries and other employees, who approved or scheduled expedited non-immigrant visa interviews, or who played any role in the process." Id.[2]

3. Search Terms: She used the following search terms: "early or expedite* or appointment or early & interview or expedite* & interview." Id. She had "[t]he Information Management Staff conduct[ ] the search of personal and hard drives because they have access to all drives from the network server, not just shared drives." Id.

4. Review of Results: She reviewed the results of the search and "removed only those clearly about wholly unrelated matters, e.g., emails about staff members' early departures or dentist appointments." Id. She "made sure that all emails residing in the shared email address folders that related to expedited appointments were included in the results . . . that were produced in electronic format and provided on cd-rom." Id. at 4.

5. Deleted Emails: "According to the Information Management staff, any emails deleted prior to [her] search" in May 2007 are gone. Id. Electronically stored information is backed up for two weeks and then the back up tapes are reused and their previous contents obliterated. Id. "No other back-up server for electronic documents, either on- or off-site, exists." Id.

6. O'Keefe Emails: "All currently existing responsive emails located during the search of Michael O'Keefe's personal drive were included in the cd-rom" that the government gave the defendants. Id. Since the hard drives from the computers O'Keefe used were previously seized by the government, they could not be searched. Id.

---

[2] In her declaration, she identified these 19 people by name. Id. She also searched electronic depositories identified as "Gold, Toronto," "Toronto NIV," "Toronto, Employment NIV Mailbox," and the files and folders of five former members of the staff. Id.

7. <u>SOPs</u>: "The only other responsive materials discovered during the electronic search for stand-alone electronic documents were the SOPs [described in paragraph 4, *supra*] and the NIV Schedule Calendar which was provided in hard copy format." <u>Id.</u>

8. <u>Lack of documents:</u> There were no responsive documents from "Mike Schimmel, the previous visa unit chief; Peggy Petrovich, the current visa unit chief; Pat Haye, the visa assistant who has main responsibility for processing expedited appointment requests; and, Jane Boyd, the visa assistant who has main responsibility for scheduling appointments for diplomatic and official applicants." <u>Id.</u>

II. <u>Problems with the Government's Production</u>

A. <u>Hard Copy Production</u>

Defendants complain that the government has produced the written documents in a manner which makes it impossible to identify the source or custodian of the document. They point out that they initially requested that the government mark the documents using the familiar Bates system of numbering documents and then advise the defendants of the Bates range for each individual's responsive documents, *i.e.*, documents from the files of John Doe would be identified in a separate index as "Doe 123-137." Since the government hasn't done this, defendants demand that the government now produce an index for its entire paper production which shows, for each document, the custodian of the documents, his or her title, the source of the document, whether it is a paper document or electronically stored information, and the Bates number of the document. Deft. Memo at 12 n8.

6

1.      Use of the Federal Rules of Civil Procedure[3]

In criminal cases, there is unfortunately no rule to which the courts can look for guidance in determining whether the production of documents by the government has been in a form or format that is appropriate. This may be because the "big paper" case is the exception rather than the rule in criminal cases. Be that as it may, Rule 34 of the Federal Rules of Civil Procedure speak specifically to the form of production. The Federal Rules of Civil Procedure in their present form are the product of nearly 70 years of use and have been consistently amended by advisory committees consisting of judges, practitioners, and distinguished academics to meet perceived deficiencies. It is foolish to disregard them merely because this is a criminal case, particularly where, as is the case here, it is far better to use these rules than to reinvent the wheel when the production of documents in criminal and civil cases raises the same problems.

2.      Rule 34 and the Form of Production of Documents

Under Rule 34(b) of the Federal Rules of Civil Procedure, a party, on whom a demand for production of documents has been made, must produce them in the form in which they are ordinarily maintained or must organize and label them to correspond with the categories of the request for production. Fed. R. Civ. P. 34(b)(2)(E)(i). While the Rule is premised on the expectation that the requesting party copies the documents once they have been produced, the more common experience is that the producing party copies the documents for the requesting party, as occurred here.

The Rule was amended in 1980 to prevent the juvenile practice whereby the producing party purposely rearranged the documents prior to production in order to

---

[3] All references to the Federal Rules of Civil Procedure are to the version effective December 1, 2007.

7

prevent the requesting party's efficient use of them. Fed. R. Civ. P. 34 advisory committee's note. See Sparton Corp. v. United States, 77 Fed. Cl. 10, 19 (Cl. Ct. 2007). In eliminating that practice and requiring the producing party to produce the documents in the same way they were kept, the Advisory Committee intended that there would be equality between the parties in their ability to search the documents. Thus, if the documents were produced as they were kept in the ordinary course of business, the requesting party could not thereafter demand that they be indexed, catalogued, or labeled. Washington v. Thurgood Marshall Acad., 232 F.R.D. 6, 10 (D.D.C. 2005); Doe v. D.C., 231 F.R.D. 27, 35 (D.D.C. 2005). The producing party can, alternatively, label the documents to correspond with the categories in the initial request, irrespective of how the documents were maintained in the ordinary course of their business.

If documents are removed from their original containers and then copied, those copies are not being produced in the manner in which the originals were ordinarily kept, since, in their original condition, the originals were most probably in labeled file folders. Therefore, to reproduce them in the manner in which they were kept would require the producing party to reproduce those file folders and place the appropriate documents in them so that the production replicates the manner in which they were originally kept. If that is not done, federal courts have required the producing party to index the documents to render them usable by the requesting party. See, e.g., Okla. ex rel Edmonson v. Tysons Food, Inc., No. 05CV329(GKF/SAJ), 2007 U.S. Dist. LEXIS 36308, at *16 (N.D. Okla. May 17, 2007) (requiring producing party to create a "complete and fully accurate index . . . showing the box number which responds to each specific Motion to Produce"); Sparton, 77 Fed. Cl. at 16 (criterion is whether the documents are so disorganized that it

would be unreasonable for the requesting party to review the documents; producing party may not provide documents in "mass of undifferentiated, unlabeled documents" but must provide them in some "organized, indexed fashion"); Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc., 240 F.R.D. 401, 411 (N.D. Ill. 2007) (party providing access to warehoused documents with master index failed to comply with Rule 34(a) where some boxes were inaccurately labeled and 1,778 boxes either had no labels or labels did not provide indicia of contents of boxes); Wagner v. Dryvit Sys., Inc., 208 F.R.D. 606, 610-11 (D. Neb. 2001) (directing plaintiffs to search through volumes of irrelevant information does not comply with Rule 34(a); that producing party has unwieldy record keeping system that requires much time and effort to find anything is no excuse); In re: Sulfuric Acid Antitrust Litig., 231 F.R.D. 351, 363 (N.D. Ill. 2005) (producing party may not dump massive amounts of documents in no logical order on their opponents; undifferentiated production of everything in boxes will not do). See also T.N. Taube Corp. v. Marine Midland Mortgage Corp., 136 F.R.D. 449, 456 (W.D.N.C. 1991) ("The Court doubts very much whether Defendant complied with the commands of [then] Rule 34(b) that documents be produced as kept in the usual course of business. It is certainly improbable that Marine Midland routinely haphazardly stores documents in a cardboard box.").

     I have not seen the documents at issue in this case, but I can say that, if all of the documents have been produced in an undifferentiated mass in a large box without file folders or labels, then these documents have not been produced in the manner in which they were ordinarily maintained as Rule 34(b)(2)(E)(i) requires. To be useful at the consulate, in their original state, they must have been placed in labeled file folders in the

file cabinets described by Ms. Petrovich. Without such file folders and labels, it is impossible to understand how anyone who needed to find these documents could have done so.

Defendants have encountered another problem: they have been provided documents from the various consulates in single consulate-specific Bates-numbered series "without providing any information regarding the custodian or source of the documents." Deft. Memo at 6. According to the defendants, this leads them to "guess about the evidentiary value of the documents—i.e., who created a document or on whose computer or in whose file a document was kept." Id. Defendants insist that, without knowing the creator of the doctor and its original location, it will be impossible to authenticate the document and offer it into evidence. Reply to Government's Opposition to Defendants' Second Motion to Compel ("Deft. Reply") at 7-8.

A piece of paper or electronically stored information, without any indication of its creator, source, or custodian may not be authenticated under Federal Rule of Evidence 901. There is an obvious solution to this problem, however. I will recommend to Judge Friedman that he deems all documents produced by the government authentic and relieve the government of the task of making the certification required by Rule 902(11) of the Federal Rules of Evidence.

        3.     Relevance

That still leaves the problem of relevance. It may be impossible to ascertain the relevance of a document without any information as to its custodian, source, author or recipient.

Defendants propose the detailed chart of every document that I have described. *Supra* at 6-7. In response, while Ms. Petrovich does not speak to how she organized what was found, the government in its opposition explains that the chart that defendants demand is not necessary because the authors and recipients of the e-mails, correspondence, and memoranda are self-evident from the documents themselves. Gov.'s Opp. at 4. The government insists that forcing consular officials to go back over the hard copy production and create the chart defendants demand would force them to do the entire search process all over again. Id.

Since the production has already occurred and the parties did not discuss this problem before hand, the eggs have been scrambled and the only hope is to try to create a solution that will take into account the needs of the defendants to discern the information they need to prove a document's relevance when it is not immediately evident from the document itself. I will therefore try to create a solution that meets the needs of the defendants to know the author, recipient (if any), date of a document, and in what file it originally was without unnecessarily burdening the government.

First, defendants' counsel and government's counsel shall meet. Defendants will produce for the government's inspection all documents that they claim cannot be identified on their faces by author, recipient (if any), date of creation, and consulate location. The parties will then attempt to arrive in good faith at a stipulation as to the author, recipient (if any), date of each such document, and where the document was found. Defendants will have the obligation to memorialize each stipulation agreed to by the parties by marking it with a Bates number so that there will ultimately be created a joint index as to these documents. Such an index would be formatted as follows:

11

| Bates Number | Author | Author's Title[4] | Recipient (if any) | Date of Creation | Location of Document |
|---|---|---|---|---|---|
| JEX 1 | John Smith | Assistant to the Visa Unit Chief | Betty Brown | 2/2/2005 | Toronto Consulate / Office of Betty Brown / File Cabinet/ Folder Labeled Expedited Appointment Correspondence |

If the government insists that the document is self-identifying and the defendants disagree, the document will have to be put to one aside and I will resolve the controversy. I would urge the government to have Ms. Petrovich available by phone and fax since she may be able to look at any document in dispute and promptly provide the identifying information upon which the stipulation may be based.

I intend to consult with the parties as necessary to expedite this process, and I would ask them to call upon me as they are doing this if they believe I can resolve any controversy.

    4.    <u>Search of Employees' Work Spaces and Other Consulates</u>

Defendants point out that Ms. Petrovich only searched the work space files of four individuals, while she searched the personal electronic files of "24 individuals, as well as other shared electronic files." Deft. Reply at 5. They also complain that the government has not explained how the search was conducted at other consulates. <u>Id.</u>

Both points are well taken. I will therefore direct the government to file a supplemental declaration from Ms. Petrovich as to why she did not search the workspace files of the 24 persons whose electronic files she searched. The government must provide declarations from representatives of the other consulates that were searched indicating

---

[4] If the role of the author is not obvious from the author's title, a description of the author's role within the Consulate shall be provided.

12

how the search was conducted.  These declarations should be in the same detail as Ms. Petrovich provided as to Toronto.

  B.  Electronic Production

  Defendants marshal several objections and concerns about the government's search of the electronically stored information.  They take the government to task for 1) not interviewing the employees as to their use of electronic means as a form of communication regarding expedited reviews, 2) not having the employees search their own electronically stored information and 3) not indicating what software it used to conduct the search or how it ascertained what search terms it would use. Id.

  Defendants caution that, if forensic searchware was not used, there is a likelihood that stored e-mail folders in .pst files were either not searched or not searched accurately.  They also note that the "government has not said anything regarding the document preservation efforts that were undertaken at the time of the Indictment or at the time the Court issued its April 27, 2008 Order."  I take up these issues in turn.

  1.  Preservation

  The government's destruction of evidence pursuant to a neutral policy and without any evidence of bad faith does not violate the due process clause if the evidence was destroyed before the defendants raised the possibility that it was exculpatory and the government had no objective reason to believe that it was exculpatory. Arizona v. Youngblood, 488 U.S. 51, 57 (1988); In re: Sealed Case, 99 F.3d 1175, 1178 (D.C. Cir. 1996).  Accord United States v. Beckstead, 500 F.3d 1154, 1158-62 (10th Cir. 2007); Bower v. Quarterman, 497 F.3d 459, 476-77 (5th Cir. 2007) (exculpatory value of destroyed evidence must be apparent before its destruction).

This principle finds its analogue in the Federal Rules of Civil Procedure, which indicate that, absent exceptional circumstances, sanctions will not be awarded for a party's failure "to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Civ. P. 37(e).

Defendants protest that there are inexplicable deficiencies in the government's production of electronically stored information, but, as I have indicated in another case, vague notions that there should have been more than what was produced are speculative and are an insufficient premise for judicial action. See Hubbard v. Potter, No. 03-CV-1062, 2008 WL 43867, at *4 (D.D.C. Jan. 3, 2008). Accusations that the government purposefully destroyed what they were obliged to produce or knowingly failed to produce what a court ordered are serious. I must therefore remind the defendants of the wise advice given the revolutionary: "If you strike at a king, kill him." If the defendants intend to charge the government with destroying information that they were obliged to preserve and produce pursuant to Judge Friedman's order or the due process clause itself, they must make that claim directly and support it with an evidentiary basis—not merely surmise that they should have gotten more than they did. If they do not do so within 21 business days of this opinion, I will deem any such claim to have been waived.

2.   Metadata

In a footnote, the defendants indicate that "[i]t is not *per se* problematic that the government produced electronic images (PDF or TIF) to the defense instead of native files—as long as the government preserves the original native files and the unaltered metadata associated with those files." Reply at 7 n.5. Defendants note further that "[i]f metadata becomes important as evidence regarding particular documents, the defense will request that it be provided by identifying such documents by Bates number." Id. Finally, defendants contend that "simply producing native files does not show that those files were produced in the manner in which they were kept in the ordinary course [and that] [t]hat showing must also be made by identifying the custodian and source of the documents produced." Id.

First, Judge Friedman's order does not speak to the format of the production of electronically stored information. Under Rule 34 of the Federal Rules of Civil Procedure, a distinction between documents and electronically stored information is made in terms of the form of production. As established above, a party is obliged to either produce documents as they are kept in the usual course of business or it "must organize and label them to correspond to the categories in the request." Fed. R. Civ. P. 34(b)(E)(i). But if, as occurred here, electronically-stored information is demanded but the request does not specify a form of production, the responding party must produce the electronically-stored information in the form in which it is ordinarily maintained or in a reasonably usable form or forms. Fed. R. Civ. P. 34(b)(E)(ii). Additionally, a party "need not produce the same electronically stored information in more than one form." Fed. R. Civ. P. 34 (b)(E)(iii).

If one were to apply these rules to this case, it appears that the government's production of the electronically stored information in PDF or TIFF format would suffice, unless defendants can show that those formats are not "reasonably usable" and that the native format, with accompanying metadata, meet the criteria of "reasonably usable" whereas the PDF or TIFF formats do not.

I appreciate that the government seems ready and willing to produce the documents in native format[5] and that may obviate the problem. I think it crucial to warn the defendants, however, that they must now secure a stipulation from the government that the electronically stored information will be preserved in its native form with metadata. If the government refuses, defendants will have to move the Court to compel the government to do so, meeting the criteria I have just specified. In the latter event, I expect the government to preserve the electronically stored information in its native format with metadata until the Court rules on the defendants' motion.

### 3. Search Terms and Other Deficiencies

As noted above, defendants protest the search terms the government used.[6] Whether search terms or "keywords" will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics. See George L. Paul & Jason R. Baron, *Information Inflation: Can the Legal System Adapt?*, 13 RICH. J.L. & TECH. 10 (2007). Indeed, a special project team of the Working Group on Electronic Discovery of the Sedona Conference is studying that subject and their work indicates how difficult this question is. See *The*

---

[5] Gov.'s Opp. at 4 n.2.
[6] Note that the defendants also take the government to task for not interviewing the employees to ascertain how often they used electronic means to create any electronic documents regarding expedited interviews. Reply at 6. But if the search terms used actually captured everything there was to capture, such interviews would be unnecessary.

*Sedona Conference, Best Practices Commentary on the Use of Search and Information Retrieval*, 8 THE SEDONA CONF. J. 189 (2008), *available at* http://www.thesedonaconference.org/content/miscFiles/Best_Practices_Retrieval_Methods_revised_cover_and_preface.pdf.  Given this complexity, for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread.  This topic is clearly beyond the ken of a layman and requires that any such conclusion be based on evidence that, for example, meets the criteria of Rule 702 of the Federal Rules of Evidence.  Accordingly, if defendants are going to contend that the search terms used by the government were insufficient, they will have to specifically so contend in a motion to compel and their contention must be based on evidence that meets the requirements of Rule 702 of the Federal Rules of Evidence.

        4.     <u>Other Consulates</u>

Judge Friedman's Order requires the government's search to be conducted at other consulates besides the one in Toronto.  I assume those searches have been conducted.  If they have not, I will direct that the parties appear before me to create a protocol for their search so that the problems the parties have confronted in the search of the Toronto consulate can be avoided.

An Order accompanies this Memorandum Opinion.


                                      /S/
                              JOHN M. FACCIOLA
Dated: February 18, 2008              UNITED STATES MAGISTRATE