**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Case No 1:06-cr-00249-PLF/JMF |
| | ) | |
| MICHAEL JOHN O'KEEFE, SR. and | ) | |
| SUNIL AGRAWAL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

Since the Court issued its February 20, 2008 Order concerning discovery, defendants have uncovered evidence of repeated violations of this Court's order and misrepresentations to the Court regarding the manner in which the government responded to its discovery obligations. Not only has the government dramatically deviated from its own standards for retention and collection of electronic evidence, it has taken steps that almost certainly have resulted in the destruction of exculpatory evidence. *See, e.g.*, Department of Justice Grand Jury Subpoena **(Ex. 1)** (*e.g.*, "outline the steps taken by the company to preserve all electronic data potentially responsive … I will then seek to determine … whether the company preserved all categories of data ….")

In sum, the government did not preserve responsive electronic data, even after the Court issued its first discovery order. Because the searches for electronic evidence were narrow, inaccurate, and incomplete, *see infra* Section I.H, responsive documents and information indisputably have been lost. *See* 4/18/08 Ltr. from AUSA Johnson (explaining that no "new electronic search could be conducted today … because none of the six posts 'froze' all of the systems on which electronic searches were conducted at the time the systems were searched")

**(Ex. 2)**; Gov't Stipulation Regarding Electronic Searches (April 18, 2008) (admitting that for two consulates "electronic documents were not preserved in any way" and for the other consulates, including Toronto, only the "electronic search *results*" were preserved) (emphasis added) [Docket No. 114].[1]

Certainly, the government cannot contend, based upon the evidence to date, that it complied with this Court's order to "conduct[] thorough and complete searches of … electronic files, in a good faith effort to uncover all responsive information.'" *United States* v. *O'Keefe*, 2007 WL 1239204 *3 n.2 (D.D.C. April 27, 2007) (hereinafter "April 27 Order"); *see generally* Declaration of Brett Harrison, FTI Consulting (hereinafter "Harrison Decl.") **(Ex. 3)**; Harrison CV **(Ex. 4)**. Finally, the evidence shows that the manner in which document searches and productions were undertaken was flatly contrary to repeated representations to this Court.

The Court's February 20, 2008 Memorandum Opinion and Order instructed defendants that "if [they] intend to charge the government with destroying information that they were obliged to preserve and produce pursuant to Judge Friedman's order or the due process clause itself," they should present that evidence in a motion. *United States* v. *O'Keefe*, 537 F. Supp. 2d 14, 23 (D.D.C. 2008) (hereinafter "February 20 Order"). The Court further instructed defendants "if [they] are going to contend that the search terms used by the government were insufficient, they will have to specifically so contend in a motion … and their contention must be based on evidence that meets the requirements of Rule 702 of the Federal Rules of Evidence." *Id*. at 24. The specific contentions responsive to the Court's February 20 Order are set forth below.

---

[1] This fact was also confirmed in an April 23, 2008 telephone interview with John Long, the Computer Management Assistant at the Toronto consulate and person who conducted the electronic searches at the Toronto consulate. *See infra* Section I.H.3.

I.      PROCEDURAL HISTORY

A.      The Government's Initial Disclosures of Electronic Evidence

On December 7, 2006, the government produced "a DVD containing emails and pictures recovered from the U.S. State[] Department computer profile "Okeefemj," which also included "emails … for [a] Yahoo/Rogers account … photographs … American Express bills … copies of fax communications" and other discovery the government considered most important to its case in chief.  *See* 12/7/06 Ltr. from B. Johnson [Motion to Compel, Docket No. 75, Ex. 6 at 1].

The data on the DVD was collected and processed by the U.S. Department of State Diplomatic Security Service, Computer Investigations and Forensics Branch ("CIF").  *See* 1/23/06 Ltr. from B. Johnson at 2-3 [Motion to Compel, Docket No. 35, Ex. 1]; *see* Harrison Decl. at ¶¶ 11, 24 (**Ex. 3**).  CIF made "[e]xact copies of [Mr. O'Keefe's] drives … and the forensic analyst, Special Agent John Wilbur, worked off of these forensic copies.  Using specialized computer software (Encase and FTK) … Agent Wilbur searched for keywords and found whole and fragmented emails that were stored or viewed on the computer."  *Id.* at 2.  The DVD also contained chain of custody receipts for the electronic data that CIF had analyzed, as well as detailed technical information about how CIF processed the electronic information.  With respect to all this "case in chief" evidence, the government clearly demonstrated its ability and willingness to take all appropriate steps to preserve, search, and support the admission of the electronic data as evidence.  This work stands in stark contrast to the government's response to the Court's April 27 Order requiring production of documents sought by the defense.  *See* Harrison Decl. at ¶ 24 (**Ex. 3**); *see also* Gov't Opp. at 14 (government intentionally chose not to use State Department forensic unit despite acknowledgement of its superior search capabilities) [Docket No. 39].

3

B.    **Mr. Agrawal's Discovery Requests**

On December 22, 2006, defendants made their initial *Brady* and Rule 16 discovery requests. *See* 12/22/06 Ltr. to B. Johnson [Motion to Compel, Docket No. 35, Ex. 3]. On January 5, 2007, defendants requested additional categories of discovery, including requests for discovery of documents related to the expedited visa appointment process. *See* 1/5/07 Ltr. to B. Johnson [Motion to Compel, Docket No. 35, Ex. 5].

On January 23, 2007, the government informed defendants that it would not respond, contending that it did "not believe that any of the information requested is material or relevant to the [case]." 1/23/07 Ltr. from B. Johnson [Motion to Compel, Docket No. 35, Ex. 1]. No steps were taken, at that time, to preserve documents responsive to those discovery requests. *See* **Ex. 2**; *infra* Section I.H.3.

C.    **Mr. Agrawal's First Motion to Compel**

On January 30, 2007, Mr. Agrawal filed a motion to compel discovery responses. On March 21, 2007, Mr. O'Keefe joined Mr. Agrawal's motion to compel. The government took no steps to preserve potentially responsive documents at that time.

During the pendency of Mr. Agrawal's motion to compel, the parties attempted to negotiate a resolution. In the course of those negotiations, the government did attempt to "resolve" one of the outstanding requests by representing that there were "no databases or data compilations available for the government to provide to Defendant Agrawal." *See, e.g.*, Gov't Opp. at 8 n.7 (February 9, 2007) [Docket No. 39]. As a result of this representation, defendants did not pursue their request for data compilations. *See* Supplemental Memorandum (Feb. 21, 2007) [Docket No. 41, Ex. 1].

One month later—the day before the March 22, 2007 hearing on defendants' motion to compel—the government hand-delivered a supplemental production of documents to

defendants.  The production contained the first of several data compilations that the government would eventually produce.[2]  Among other things, the production contained data from "a calendar system that was maintained by [Patricia] Haye as an internal tracking method for expedited appointments in Toronto"—the exact evidence defendants had requested months earlier.  *See* Post-Hearing Memorandum, Ex. 1 (March 24, 2007) [Docket No. 45].

The March 21 supplemental production also contained certain statements concerning the manner in which expedited visa appointments were scheduled and processed that contradicted both the Indictment and the government's prior representations.  For example, the March production admitted that the Non-Immigrant Visa Chief in Toronto had "authorized a foreign service national, Pat Haye, to … *unilaterally* grant[] expedited interviews for emergencies and business reasons."  3/21/07 Ltr. from AUSA Johnson, at 2-3 (**Ex 5**) (emphasis added) [Docket No. 45, Ex. 1].  At the motion to compel hearing the next morning, defendants argued that the government's eleventh-hour revelation confirmed defendants' contentions:  "not only were there no formal procedures, but it was very likely … that non-official personnel—in fact, people who aren't even Americans—… [are] granting these requests for expedited appointments."  3/22/07 Hr'g. Tr. at 44-47.  As the Court noted in granting the motion to compel, that evidence would tend to negate both the corrupt intent and official act elements of 18 U.S.C. § 201.  *See* April 27 Order, 2007 WL 1239204, at *1, 3 (it goes "directly to the defense[s] of showing that … other requests for expedited visa interview appointments have routinely been granted without the provision of anything of value" and "undercut[ing] the formality of the process as suggested by the indictment.")

---

[2] *See, e.g.*, 3/21/07 Ltr. from AUSA Johnson, at 3 ("The government has recently learned of the existence of a calendar system ….") [Docket No. 45, Ex. 1]; 4/13/07 Ltr. from AUSA Johnson, at 1 ("[T]he government also recently learned that some information regarding the scheduling of expedited appointments can be tracked ….").

At the hearing on the motion to compel, counsel for Mr. Agrawal asked the Court:

> [How] do I get this woman [Pat Haye] to this courtroom? She's a Canadian citizen. I can't subpoena her…. I think I'm going to need to ask [the Court], in some subsequent filing shortly, that the government either make her available for interview or allow me to depose her or I'll need letters rogatory…. But here is a woman who is obviously a noncitizen in possession of critical evidence ….

3/22/07 Hr'g. Tr. at 47. Immediately following the hearing, the prosecution approached counsel for Mr. O'Keefe and Mr. Agrawal and offered to arrange an interview with Ms. Haye. The government subsequently reneged on that offer. *See infra* note 15.

### D.    The Court's April 27, 2007 Order

On April 27, 2007, the Court issued a memorandum opinion and order, granting defendants' motion to compel in substantial part. The Court held:

> [T]he government must produce all written rules, policies, procedures and guidelines regarding the treatment of expedited visa application appointments and visa application approvals at the above-mentioned posts in Canada and Mexico. Because such policies and procedures may not be formalized, however, the government must also produce any memoranda, letters, e-mails, faxes and other correspondence prepared or received by any consular officers at these posts that reflect either policy or decisions in specific cases with respect to expediting…. Moreover, it now appears from discovery produced on March 21, 2007 that employees below the level of consular officers—including even consulate secretaries and non-U.S. citizen employees—may approve requests for and schedule expedited visa interview appointments. The files of any such persons and the consulates themselves therefore also must be searched. Such communications go directly to the defense of showing that the requests made by or on behalf of STS employees are similar to other requests for expedited visa interview appointments that (it is asserted) have routinely been granted without the provision of anything of value.
>
> [n.2] …. The Court expects the government to respond to this Court's order by conducting thorough and complete searches of both hard copy files and electronic files, in a good faith effort to uncover all responsive information in its "possession, custody or control." FED. R. CRIM. P. 16(a)(1)(E). And, as stated above, the government cannot take a narrow or parsimonious view of its obligations. The Court will not, however, micromanage the search process by listing the key word search terms that must be used for the government to meet its obligations under Rule 16 and

this Court's order or its professional and ethical obligations as representatives of the United States and officers of the Court.

April 27 Order, 2007 WL 1239204, at *2-3 (emphases added).

### E.    The Government's Response to the April 27 Order

The government responded by resisting the April 27 order.  For example, it asserted in a request for a follow-up status conference that the discovery ordered was a "fishing expedition/exercise … [that] is meaningless and a waste of everyone's time including the court." Mot. for Status Hr'g. n.1 (May 22, 2007) (emphasis added) [Docket No. 53]; *see also* 9/12/07 Hr'g Tr. at 18-28¸ *excerpts quoted in* Reply to Gov't Opp. to Defs' 2d Mot. to Compel at 1-2 (Nov. 2, 2007) [Docket No. 79].  Following the June 19, 2007 status conference, however, the government indicated that it would produce the documents responsive to the April 27 Order by August 1, 2007.  In fact, responsive documents continued to trickle in for several months after August 1, leading to a "final" production on March 5, 2008.  *See* 3/5/08 Ltr. from B. Johnson **(Ex. 6)**.

During that time, defendants attempted to resolve various issues and problems with the document productions, including "gaps"[3] in the productions and a myriad of technical problems[4] with the productions.  Because the documents were produced in such a physically scrambled format, the government still is attempting to provide defendants with information

---

[3] For example, defendants repeatedly insisted that contrary to the government's representations, the Toronto consulate had not produced any emails or electronic documents. *See* Motion to Compel, Docket No. 75, at 2-3. After almost a month of discussions, the government admitted that it had inadvertently failed to produce *any* electronic documents from the Toronto consulate. *See id.*, Ex. 5.

[4] For example, the government produced the majority of hard copy file documents from Toronto in electronic format by scanning and converting those documents into single-page images (.TIF files).  However, the government failed to provide defendants with any way to precisely determine the document boundaries of multi-page documents. Despite the haphazard manner in which the government produced the documents, defendants did their best to work with the discovery in the form in which it was provided.  Defendants have spent hundreds of hours and thousands of dollars trying to deduce logical document breaks and other information about how expedited appointment requests were handled. *See* Defs' Second Mot. to Compel [Docket Nos. 75-78].

"they need to prove a document's relevance."  *See* February 20, 2008 Order, 537 F. Supp. 2d at 21.

### F.    Defendants' Second Motion to Compel

Because of the manner in which documents were produced, defendants requested that the government provide them with certain information necessary to use the documents— including identification of the custodian and source of the documents.  *See* 8/23/07 Ltr. to B. Johnson ("please provide … a summary of the data types searched for each individual … and the Bates range for the production of each individual's responsive documents").  The government refused.

On October 9, 2007, defendants filed their second motion to compel.  On October 26, 2007, the government filed its opposition, which included a Declaration of Peggy Petrovich, United States Consul at the Toronto consulate, setting forth information regarding the consulate's efforts to comply with the April 27 Order.  According to the Declaration, Ms. Petrovich "was responsible … for coordinating and overseeing" the consulate's response to the Court's order.  *See* Petrovich 1st Decl. at 1 (**Ex. 7**).  Among other things, Ms. Petrovich declared under oath:

> …. The <u>parameters of the electronic search included all email and stand-alone electronic documents,</u> *e.g.*, documents prepared on our office software applications, regarding expedited appointments located <u>on shared drives, personal drives and hard drives for all consular officers and locally-engaged staff</u>, *i.e.*, secretaries and other employees, who approved or scheduled expedited non-immigrant visa interviews, or who played any role in the process.  Specifically, <u>Toronto searched for materials maintained in the files or folders of the following individuals</u>, some of whom had already departed post, <u>as well as the specified shared mailboxes</u>:  … "Gold, Toronto," Toronto NIV," and "Toronto, Employment NIV Mailbox"….

> For the email and stand-alone electronic document searches, <u>we used the following search parameters</u>: "early or expedite* or appointment or early & interview or expedite* & interview."  The Information Management staff <u>conducted the search of personal and hard drives because they have</u>

> access to all drives from the network server, not just shared drives ….
> Additionally, I made sure that all emails residing in the shared email
> address folders that related to expedited appointments were included in the
> results.  All responsive emails located during the search were produced in
> electronic format and provided on cd-rom.

Petrovich 1st Decl. at 2-3 (emphases added)(**Ex. 7**).  On October 29, 2007, the Department of

Justice provided defendants with "a copy of all electronic materials provided by the U.S. State

Department in their original formats."  *See* 10/29/07 Ltr. from B. Johnson **(Ex 8)**.  As set forth

below, many of the crucial assertions in Ms. Petrovich's declaration have proven to be untrue.

G.      **The Court's February 20, 2008 Order**

On February 20, 2008, the Court issued a discovery order addressing problems

with the manner and form in which the government made its document productions and requiring

the government to provide defendants with certain stipulations and to file additional declarations.

The Court specifically relied on representations made by Ms. Petrovich in issuing its

memorandum opinion and order.  *See* February 20, 2008 Order, 537 F. Supp. 2d at 16-18 & n.2

(*e.g.*, "She searched all active servers and backup tapes … [T]he electronic search included all

email and stand-alone electronic documents … She also searched electronic depositories

identified as "Gold, Toronto," "Toronto, NIV," "Toronto, Employment NIV Mailbox ….").

H.      **The Government's Post-Order Revelations**

1.      **Ms. Petrovich's Second Declaration**

In response to the February 20, 2008 Order, the government filed a second

declaration by Ms. Petrovich on March 4, 2008.  *See* Petrovich 2d Decl. [Docket No. 92, Ex. 1]

**(Ex. 9)**.  In her second declaration, Ms. Petrovich stated under oath:

> Toronto's Information Management staff conducted <u>an electronic search</u>
> for responsive materials maintained <u>in the electronic files or folders</u> of the
> following [locally engaged staff ("LES")]:  Jane Boyd, Althea Brathwaite,
> Rose Castro, Maribel Ebona, Maria Erlindson, Pat Haye, Michael Niles,
> and Janice Thompson …

> Toronto's Information Management staff conducted <u>an electronic search</u> for responsive materials maintained <u>in the electronic files or folders</u> of the following Foreign Service officers and U.S. citizen employees … Stephanie Arnold, Lindsay Henderson, James Jewett, Susan Lively, John Nay, Michael O'Keefe, Peggy Petrovich, Penny Rogers, April Scarrow, Laura Scheibe, Michael Schimmel, Sarah Sexton, Donald Steele, Robbie Thomas, Jeff Tunis, and John Whiteley

Petrovich 2d Decl. at 1-3 (emphases added)(**Ex. 9**).

### 2.    April 9, 2008 Telephone Conversation with Gilbert Furtado

In response to a defense request, the government identified Gilbert Furtado, former Chief Communications Officer at the consulate, as the person that performed the alleged electronic document searches described in Ms. Petrovich's declarations.  On April 9, 2008, defense counsel, Brett Harrison (FTI Consulting), and representatives of the Department of Justice and State Department participated in a telephone interview with Mr. Gilbert Furtado.  Although it was clear that Mr. Furtado did not actually conduct the electronic searches himself, Mr. Furtado disclosed a number of facts about the searches, including:

- Ms. Petrovich asked Mr. Furtado to search email files for certain people and she gave Mr. Furtado the phrases to use in the search.

- No searches were performed on laptop or desktop hard drives.

- Consulate employees have the ability to save or archive email in "personal folders" (".pst files") which are stored on the network server.

- Mr. Furtado had no information about whether personal folders were searched.

- Mr. Furtado was not sure how the electronic searches were executed or what search tools were used because he delegated the assignment to a computer administrator named John Long.

- Email is routed through a central State Department Microsoft Exchange server.  When a consular officer is transferred from Toronto to another post, the consular officer continues to have access to his or her account, but the Toronto consulate no longer has the ability to search that email.

- No backup tapes were taken out of circulation for preservation purposes.

- Mr. Furtado has no notes regarding the document search process: "everything I had, Peggy [Petrovich] has."

**3.    April 23, 2008 Telephone Conversation with John Long**

On April 23, 2008, defense counsel, Brett Harrison, and representatives of the Department of Justice and State Department participated in a telephone interview with John Long at the Toronto consulate.   During the conversation, Mr. Long made the following statements regarding the electronic document searches the Toronto consulate performed in response to this Court's order:

- Mr. Furtado asked Mr. Long to do the electronic search of email mailboxes based upon specific phrases.  *See* Harrison Decl. at ¶ 16 (**Ex. 3**).

- Mr. Long said he was asked to search for the following specific phrases: 'early appointment,' 'early interview,' 'expedite appointment,' and 'expedite interview.'

- The searches were conducted on "a list of individuals' mailboxes" that Mr. Long was given.

- Mr. Long restored email mailboxes for the individuals on the list from the consulate's UltraBackup system.

- Once restored, Mr. Long used the Microsoft Outlook search utility to conduct a separate search of each individual email mailbox.

- Mr. Long used phrase searching, not individual term searching.  Mr. Long did not use wildcard characters in his searches.  *See* Harrison Decl. at ¶ 19 (**Ex. 3**).

- The Microsoft Outlook search utility would not have searched attachments to emails, only the contents of emails.  *See* Harrison Decl. at ¶ 19 (**Ex. 3**).

- Mr. Long did not search email stored in .pst files on local hard drives or network drives, and Mr. Long was never asked to search these files.[5]

---

[5] Mr. Long awkwardly adjusted his statement after several minutes, representing that he actually did search both the personal folders on the network "P" drive <u>and</u> the data from the Microsoft Exchange Server.  His representation appears inconsistent, however, because the search universe consisted of mailboxes restored from the UltraBackup system, and Mr. Long previously stated that those mailbox "restores" would not include email from network drive .pst files.  Mr. Long stated that there was no way to differentiate between responsive emails he allegedly obtained from the "P" drive and responsive emails he obtained from the Exchange server.

- Mr. Long was never asked to search for stand-alone electronic documents, including Word documents, and in fact, did not search for any stand-alone electronic documents on hard drives or network drives. *See* Harrison Decl. at ¶¶ 17-23 (**Ex. 3**).

- Mr. Long did not search any shared mailboxes, including shared mailboxes used specifically for expedited appointments. *See* Harrison Decl. at ¶ 22-24 (**Ex. 3**).[6]

- Mr. Long had no knowledge of any document preservation notice issued to the consulate employees in connection with this case. *See* Harrison Decl. at ¶ 22 (**Ex. 3**).

- The consulate did not pull any backup tapes out of circulation at the time Mr. Long conducted the searches. *See* Harrison Decl. at ¶ 10-11 (**Ex. 3**).

- The only data preserved by the consulate were the email "hits" resulting from the four search phrases. The original email universe restored from the UltraBackup system is no longer available because the tapes were put back into circulation.

- The consulate did not make any forensic images of laptop or desktop hard drives for preservation purposes. *See* Harrison Decl. at ¶ 18, 22 (**Ex. 3**).

At the conclusion of the call, defendants asked the government to provide them with a copy of an email Mr. Long referenced and used to refresh his recollection during the call. After initially refusing, the government produced the email on May 15, 2008. *See* 5/15/08 Ltr. to B. Johnson (**Ex. 10)**; 5/29/07 J. Long email (**Ex. 11**).

### 4.      Government's Stipulation Regarding Electronic Searches

On April 18, 2008, in response to the February 20, 2008 Order, the government served defendants with a proposed Stipulation Regarding Electronic Searches *See* Docket No. 114. That stipulation stated that for two consulates "electronic documents were not preserved in any way" and that for the other consulates, including Toronto, only the "electronic search *results*" were preserved in native format. *See id.*      Moreover, the letter accompanying the

---

[6] In particular, Mr. Long also identified potentially another mailbox used for expedited appointments—"TRT, NIV Expedited Apt"—that was not disclosed by the government and which was not searched. *Cf.* February 20, 2008 Order, 537 F. Supp. 2d at n.2.

stipulation confirmed that because the consulates did not preserve data from any of "the systems on which the electronic searches were conducted at the time the systems were searched," electronic documents existing at the time of the April 27 Order have now been overwritten or deleted and no new searches can be performed.  4/18/08 Ltr. from AUSA Johnson **(Ex. 2)**.

## II.     ARGUMENT

### A.     Legal Standard:  Constitutionally Guaranteed Access to Evidence

#### 1.     *Brady* **and Rule 16 Material**

The prosecution has an affirmative duty to disclose "evidence favorable to the accused."  *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963); *United States* v. *Agurs*, 427 U.S. 97 (1976).  "The only question before (and even during) trial is whether the evidence at issue may be 'favorable to the accused'; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial."  *United States* v. *Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005).  *Brady* material includes "any information in the possession of the government—broadly defined to include all Executive Branch agencies—that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses.  It covers both exculpatory and impeachment evidence."  *Id*. at 16-17 (citing *United States* v. *Bagley*, 473 U.S. 667, 676-77 (1985).

Upon a defendant's request, the prosecution also has a duty to disclose, *inter alia*, all "books, papers, documents, data, photographs, tangible objects, buildings or places ... "within the government's possession, custody, or control" that are "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E); *see Safavian*, 233 F.R.D. at 15 ("Rule 16 is intended to provide a criminal defendant the widest possible opportunity to inspect and receive such materials ... as may aid him in presenting his side of the case.").

### 2.    The Prosecution's Duty to Preserve *Brady* and Rule 16 Evidence

The duties of disclosure under *Brady* and Rule 16 imply duties of preservation on the government. *California* v. *Trombetta*, 467 U.S. 479, 488-89 (1984); *see also United States* v. *Bryant*, 439 F.2d 642, 650-51 (D.C. Cir. 1971). It is hornbook law that when a party (including the government) is on notice that certain documents are potentially relevant, that party has a legal duty to preserve those documents. *See Kidwell, Neumbeier, and Hansen, Electronic Discovery* § 4.01 (2008 Law Journal Press); *Miller* v. *Holzmann*, 2007 WL 172327 *6 (D.D.C. January. 17, 2007) (quoting The Sedona Conference, *Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 44 (2004 Annotated Version)). The government's duty to preserve evidence is triggered, for example, when a discovery request is made, when a motion to compel is filed, or when a court orders production of *Brady* or Rule 16 material. *Cf. United States* v. *O'Keefe*, 537 F. Supp. 2d at 22 ("The government's destruction of evidence pursuant to a neutral policy and without any evidence of bad faith does not violate the due process clause *if the evidence was destroyed before the defendants raised the possibility that it was exculpatory*….") (emphasis added).

### 3.    Destruction of *Brady* and Rule 16 Evidence

In *Brady* v. *Maryland*, the Supreme Court held that suppression (or destruction) of exculpatory evidence "violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*." *Brady*, 373 U.S. at 87 (1963) (emphasis added). The Supreme Court has subsequently held that "the *Brady* duty extends to impeachment evidence as well as exculpatory evidence." *Youngblood* v. *West Virginia*, 547 U.S. 867, 869-70 (2006) (citing *Bagley*, 473 U.S. at 676). In addition, the destruction of "*potentially useful evidence*" by the government constitutes a denial of due

process of law where there is a showing of bad faith in failing to preserve the evidence.  *Arizona* v. *Youngblood*, 488 U.S. 51, 57-58 (1988); *see also U.S.* v. *O'Keefe*, 537 F. Supp. 2d at 23.

### 4.    The Government's Duty to Search for *Brady* and Rule 16 Material

The government has an affirmative duty to search possible sources of exculpatory information and to make a "systematic response."  *See Safavian*, 233 F.R.D. at 17-19.  The government's duty was amplified in this case by the Court's April 27 Order.  *See* April 27 Order, 2007 WL 1239204 *2-3 ("Court expects the government to respond to this Court's order by conducting thorough and complete searches of both hard copy files and electronic files, in a good faith effort to uncover all responsive information . . . .  [T]he government cannot take a narrow or parsimonious view of its obligations").  The affirmative duty to "search" includes a duty to actively supervise and manage compliance.  *See Zubulake* v. *UBS Warburg LLC*, 229 F.R.D. 422, 432-33 (S.D.N.Y. 2004).  Such supervision is particularly important where, as here, individuals have the potential to be embarrassed, impeached, or found in violation of State Department "policy" or "procedures" as the result of the documents uncovered and produced. *See Safavian*, 233 F.R.D. at 19 n.5 (D.D.C. 2005) (rebuking the Department of Justice for not making appropriate inquiries to the GSA about electronic data).

### B.    The Government Failed To Comply With The April 27 Order

### 1.    The Evidence Sought by Defendants is *Brady* Material

The information sought in defendants' discovery requests regarding the expedited appointment process is *Brady* material.  *See Safavian*, 233 F.R.D. at 16-17 (*Brady* covers exculpatory and impeachment evidence).  The Court already has held that documents requested are material to the defense because they are potentially exculpatory.  *See* April 27 Order, 2007

WL 1239204, at *2-3.[7]    And defendants have consistently maintained that the documents are exculpatory.  *See* 3/22/07 Hr'g. Tr. at 44-47 ("I think this is *Brady*….  Because I think this undercuts the whole contention that permeates this indictment.").  The Court's ruling on this issue is amply supported by the government's admissions,[8] by external sources,[9] and by the discovery produced to date.

2.    <b><u>The Government Did Not Take Any Steps to Preserve <i>Brady</i> Material</u></b>

Defendants first raised the possibility that the documents sought were exculpatory on December 22, 2006.  *Cf. United States* v. *O'Keefe*, 537 F. Supp. 2d at 22.  That request was followed by a supplemental request on January 5, 2007 and defendants' first motion to compel on January 30, 2007.  The Court granted defendants' motion in relevant part on April 27, 2007.

Despite the government's knowledge and indications of the potential exculpatory value of the evidence, at no time did the State Department or Justice Department take steps to preserve potentially responsive information—and in particular electronic evidence—requested by defendants and ordered by the Court.  *See* 4/18/08 Ltr. from AUSA Johnson **(Ex. 2)** (the government never preserved any electronic backup tapes); Gov't Stipulation Regarding Electronic Searches  ("electronic documents were not preserved in any way" for two consulates

---

[7] *See* April 27 Order, 2007 WL 1239204 *1 ("obtaining documents through discovery …, defendants maintain, will undercut any evidence offered by the government concerning the formality of the process … [and] the government's ability at trial to show corrupt [intent]."); 9/12/07 Hr'g Tr. at 18-28 ("[I]t would purport to negate the notion that [what] he was doing was out of the ordinary.  If it is ordinary, then the jury can deduce that since it was ordinary they may not deduce therefrom that it was done with an evil intention.  If the same thing is done for everyone, and what these gentlemen did is not exceptional, they're not guilty.  Isn't that true?"); *United States* v. *O'Keefe,* 509 F. Supp. 2d 33, 36 (D.D.C. 2007).

[8] *See* **Ex. 3**.

[9] *See, e.g.*, Beppi Crosariol, *Hollywood's Go-To Guy*, GLOBE AND MAIL, Oct. 30, 2004 [Motion to Compel, Docket No. 35, Ex. 3] ("[Film] production has already begun, and [Keira] Knightley, a British citizen, urgently needs a U.S. visa to cross the border in time to make the first day of shooting.  Back in London, the paperwork might have taken weeks to clear.  Here in Toronto, she'll be in and out of the U.S. consulate and zipping back to the airport by 3:30 p.m. if all goes well today.  And it does…. [] The local [Toronto] consulate, besides its handy proximity to the U.S. border, has adopted an express-lane approach to film productions….  "Consulates do need to recognize the economic interests of a country [and] [t]his consulate, because it sees so much film work, has a unique understanding….  [S]eizing on a legal provision that awarded fast-track exemptions to 'business people'" Mr. Trister said, "Hey, just because they work in the film industry doesn't mean they're not business people."

and at Toronto, only the "electronic search *results*" were preserved) [Docket No. 114]; *see also* Petrovich 1st Decl. at ¶ 8 (**Ex. 7**). The absence of any effort to preserve exculpatory evidence was also confirmed by John Long. *See supra* Section I.H.3 (no knowledge of any document preservation notice being issued, no backup tapes taken out of circulation before or after the Court's April 27 Order, no laptop or desktop data was ever searched or preserved, and no electronic data was preserved except for the limited set of email "hits" resulting from the consulate's searches).

The government admits that none of the consulates suspended their ordinary destruction practices or procedures at anytime. *See* 4/18/08 Ltr. from B. Johnson (**Ex. 2**); Gov't Stipulation Regarding Electronic Searches (April 18, 2008) [Docket No. 114]; *supra* Section I.H.2-3. Indeed, it appears that the government never even bothered to issue a document "hold notice" to the employees identified in Ms. Petrovich's Declarations. *See id*. As a result, the government confirmed that electronic documents which may have existed have now been destroyed. *See* 4/18/08 Ltr. from B. Johnson (**Ex. 2**); *see* also 5 Foreign Affairs Manual ("FAM") § 476; *Holzmann*, 2007 WL 172327 *6.

### 3.    The Government's Search for Electronic Evidence Was Fundamentally Flawed and Inadequate

The searches conducted in this case did not constitute "*thorough and complete searches of … electronic files, in a good faith effort to uncover all responsive information*….'" April 27 Order, 2007 WL 1239204 *3 n.2. To the contrary, the consulate conducted what could objectively be characterized as an extremely "narrow or parsimonious" approach to searching for responsive electronic documents. Because the government only "preserved" the flawed outcome of its search, a substantial volume of documents called for by the April 27 Order have now been destroyed. *See* 4/18/08 Ltr. from B. Johnson (**Ex. 2**). Based upon what can now be

17

reconstructed, there are at least seven major—and irremediable—problems with the government's searches.

> ### (i)    Contrary to Ms. Petrovich's Declarations, the Toronto consulate did not search shared email mailboxes specifically designated for expedited appointment correspondence.

Ms. Petrovich declared that "Toronto searched for materials maintained in … *the specified shared mailboxes … "Gold, Toronto," Toronto NIV," and "Toronto, Employment NIV Mailbox"* using designated keywords. Petrovich 1st Decl. at ¶¶ 6-7 (**Ex. 7**). The government produced no documents from any of these shared mailboxes—even though these mailboxes were created and maintained to house correspondence related to expedited appointments. *See, e.g.*, Harrison Decl. at ¶ 17-18, 22 (**Ex. 3**); *see also* Toronto Emergency or Expedited Visa Information, *available at* http://www.amcits.com/ emergency_visa.asp (last visited June 6, 2008) ("Applicants request an expedited appointment by email addressed to … TRTNIV@state.gov."); **Ex. 12** at TOR_0000228 ("notify the applicant of approval or denial of appointment *by email*.") (emphasis added).

Mr. Long now has confirmed that he never searched any of the shared expedited appointment mailboxes, *see supra* Section I.H.3, and the government admits that the shared email mailbox evidence that existed over a year ago is now destroyed and unrecoverable. *See* 4/18/08 Ltr. from B. Johnson (**Ex. 2**).

> ### (ii)    Contrary to Ms. Petrovich's Declarations, the Toronto consulate did not electronically search for <u>any</u> stand-alone electronic documents.

Ms. Petrovich declared that "[t]he parameters of the electronic search included all email and *stand-alone electronic documents, e.g., documents prepared on our office software application…. For the [stand-alone] electronic document searches, we used the following search parameters*…." Petrovich 1st Decl. at ¶¶ 6-7 (**Ex. 7**) (emphasis added). That statement is false. The government has never produced a single stand-alone electronic document that was

retrieved through an electronic search.  *See* Harrison Decl. at ¶ 22 (**Ex. 3**).  Mr. Long confirmed that he was never asked to (and never did) search for stand-alone electronic documents, including Word documents, memoranda, correspondence, or other responsive material.  *See supra* Section I.H.3.  Among other things, the failure to search for responsive electronic documents overlooked the numerous responsive documents that appear to have existed on shared ("W") drive locations[10] and individual employee desktop and laptop computers.  *See* Harrison Decl. ¶ 18, 22 (**Ex. 3**).

> The government represented to the Court that the only "responsive materials discovered during the electronic search for stand-alone electronic documents were the [Standard Operating Procedures ("SOPs")] … and the NIV Schedule Calendar which was provided in hard copy format."  *See O'Keefe*, 537 F. Supp. 2d at 18.  In fact, these documents were not "discovered"—and could not have been discovered—based upon an electronic search because none of these documents contains any of the search phrases Mr. Long stated were used to locate electronic documents.  *See supra* Section I.H.3 and *infra* Section II.B.3(v); Harrison Decl. at ¶ 17 (**Ex. 3**).

> The few hardcopy documents from electronic sources that were produced, including the SOPs, must have been known, identified, and manually retrieved by someone at the consulate by navigating to the file and path location of the documents.  *See Safavian*, 233 F.R.D. at 19 (self-identification alone "is not the systematic response that is required of the government")  Any responsive documents that were not manually retrieved and recovered are now unrecoverable.

---

[10] For example, "W:/cons/niv/correspondence" and "W:/cons/niv/Biz Visa Expedite"

          *(iii)*    *Contrary to Ms. Petrovich's Declarations, the Toronto consulate did not search any hard drives.*

      Ms. Petrovich's declaration provides that the electronic search included "all email and stand-alone electronic documents … *located on shared drives, personal drives and hard drives for all consular officers and locally-engaged staff. . . .* The Information Management staff conducted the search of personal and hard drives because they have access to all drives from the network server, not just shared drives." Petrovich 1st Decl. at ¶ 6 (**Ex. 7**) (emphasis added). Those statements are untrue. Mr. Long, the person who actually conducted the electronic searches, confirmed that he was not asked to (and did not) search the shared drives, personal drives or hard drives of consulate personnel. The absence of stand-alone electronic documents in the government's productions corroborates Mr. Long's statements. *See* Harrison Decl. at ¶ 22 (**Ex. 3**). Mr. Long also stated that consulate employees have the ability to archive email in user created .pst files on their hard drives or on a shared drive. None of those locations were searched, despite a specific Court order to conduct "thorough and complete searches of … electronic files" April 27 Order, 2007 WL 1239204, at *3; *see also Safavian*, 233 F.R.D. at 19 (complete search includes searching for "all e-mails—including archived e-mails on hard drives").

          *(iv)*    *The email search tool used by the Toronto consulate did not search attachments to email.*

      The Toronto consulate used the Microsoft Outlook search function to search email from the network server. *See supra* Section I.H.3. The consulate did not use any other search program because it only searched email. As Mr. Long understood, the Microsoft Outlook search function did not and could not search attachments to email. *See id.*; Harrison Decl. at ¶ 19 (**Ex. 3**). Thus, the searches that were conducted on individual email accounts would not have retrieved any responsive attachments unless the email itself contained one of the specific phrases

used in the search. This is additionally problematic because, at least for some time period, it appears the Toronto consulate asked applicants complete an electronic expedited request form that was submitted via email as an attachment.

> **(v)      The keyword searches performed by the Toronto consulate were insufficient, unreliable, and at variance with Ms. Petrovich's Declaration.**

The Court has correctly noted that selecting appropriate keywords "involv[es] the interplay, at least, of the sciences of computer technology, statistics and linguistics." *O'Keefe*, 537 F. Supp. 2d at 24. In this case, defendants specifically suggested terms that should be used. *See* Proposed Order, Motion to Compel [Docket No. 35]. Although the Court warned the government not to be narrow or parsimonious in its approach, the Court declined to "micromanage the search process by listing the key word search terms that must be used for the government to meet its obligations under Rule 16 and this Court's order or its professional and ethical obligations as representatives of the United States and officers of the Court." April 27 Order 2007 WL 1239204, at *3 n.2.

When it came time to develop its search terms, the government ignored defendants' proposed search terms and instead took an extremely limited approach to locating responsive electronic documents. According to a May 29, 2007 email **(Ex. 11)**, the searches used by the consulate were designed to identify documents containing *one of four precise search phrases*. *See also supra* I.H.3 (confirming that search phrases were used); Harrison Decl. at ¶ 17 **(Ex. 3)**. According to Mr. Long, he was instructed to conduct an electronic search for the following precise search phrases: "'early appointment,' 'early interview,' 'expedite appointment,' [or] 'expedite interview.'" *See supra* Section I.H.3. This four-phrase search string was approved by Gilbert Furtado and Peggy Petrovich in May 2007. *See* 5/29/07 Email **(Ex. 11)**.

This search string conflicts with the Declaration of Ms. Petrovich which stated that "[f]or the email and stand-alone electronic document searches, we used the following search parameters: "*early or expedite\* or appointment or early & interview or expedite\* & interview.*" Petrovich 1st Decl. at ¶ 7 (**Ex. 7**) (emphasis added). Mr. Long specifically confirmed that he did not use wildcard searches—*i.e.*, searches for variations on the words—as Ms. Petrovich indicated in her Declaration by the use of an asterisk. Given that the only searches conducted used the search function in Microsoft Outlook and that Microsoft Outlook does not allow for wildcard searches, Mr. Long's recollection would appear correct. *See supra* Section I.H.3; Harrison Decl. at ¶ 19 (**Ex. 3**); *see also* Gov't Opp. at 14 ("posts do not have the capability to run searches using the search tools of '*'") [Docket No. 39]; Supp. Mem. at n.9 [Docket No. 41]. Additionally, even if the searches performed by the consulate had included wildcards, as shown below, the government's searches were extremely narrow and would not have, for example, "hit" on documents containing plainly relevant terms like "earlier appointment," "emergency appointment," "waive appointment," or "same day service."

Based on the search criteria set forth in the May 29, 2007 email, unless one of the four two-word phrases exactly appeared in an electronic document searched by the consulate, that document would not have would have produced a "hit" (*i.e.*, been identified) and would not have been produced by the government. This means, for example, that documents containing words or phrases that varied by a single letter—*i.e.*, a plural rather than a singular noun—would not be identified or collected. For example, a document only containing the phrase "expedite**d** appointment"—rather than "expedite appointment"—would not have been identified and produced by the search phrases described by Mr. Long and set forth in the May 29, 2007 email. Searching in this manner virtually guaranteed that many responsive and exculpatory documents

would not be located.  *See also* 8 Sedona Conf. J. 218 (describing phrase searching and wildcard operators).

        For obvious reasons, it is impossible to prove exactly which documents were not captured by the government's searches (and subsequently destroyed).  But hard copy documents produced by the government (which were identified because of their specific, physical file locations rather than by keywords) demonstrate critical flaws in only using the search phrases described by Mr. Long.  In particular, as summarized in the below chart, the government has produced scanned print-outs of State Department "protocols," which generally purport to govern the expedited appointment process.  *See* **Ex. 12 (**TOR_0000224 through TOR_0000233) (filed under seal) (the most common term in these documents is "expedite**d** appointment").  Those documents do not contain any of the four phrases—*i.e.*, "early appointment," "early interview," "expedite appointment," or "expedite interview"—described in the May 29, 2007 email.  Thus, the very "protocols" which purport to govern this process would not have been located using the government's search terms.  The same is true for the State Department policies and procedures currently posted on the Internet and the "Blue Sheet" forms the consulate used to expedite interviews.  *See* Emergency or Expedited Visa Interviews *available at* http://www.amcits.com/ emergency_visa.asp#toronto (last visited June 5, 2008); **Ex. 13** (Blue Sheet).  Indeed, the instructions on the website specifically direct that requests by email "must state: Expedited Visa Appt. Request" in the subject line.  But the search phrases in the May 29 email would not have "hit" upon that text.

| Bates Number(s) | Contains Search Phrase Used By Consulate Per May 29, 2007 Email? | Actual Subject Matter Term(s) Contained in Document |
|---|---|---|
| Blank "blue sheet" used to grant expedited appointment requests | No | "waive appointment" (2x) <br> "same day service" |

| Bates Number(s) | Contains Search Phrase Used By Consulate Per May 29, 2007 Email? | Actual Subject Matter Term(s) Contained in Document |
|---|---|---|
| Expedited appointment policies at TOR_0000224 through TOR_0000233 | No | "expedited appointment" (18x)<br>"EXPEDITED NONIMMIGRANT VISA APPOINTMENTS"<br>"expedited appointment's"<br>"EXPEDITED APPT"<br>"Expedited Petition-Based Employment Visa Appointment(s)"<br>"expedited visa appointments"<br>"Expedited Employment Appointments"<br>"expedite their interview date" (2x)<br>"unexpected business meeting" (2x)<br>"emergency appointment(s)" (3x)<br>"expedite appointments" (2x)<br>"expedited cases"<br>"expedited processing" (2x)<br>"expedited appointments"<br>"expedited handling"<br>"expedited criteria" (2x)<br>"expeditious handling |
| Current policies posted on the Internet | No | "Emergency or Expedited Visa Interviews"<br>"emergency or expedited non-immigrant U.S. visa interview appointments"<br>"emergency or expedited interview appointments"<br>"expedited appointment" (3x)<br>"Expedited Visa Appt. Request" |

In order to begin estimating the volume of exculpatory evidence that was not located and produced (and subsequently destroyed) from electronic sources because of the government's stilted and narrow search terms, defendants prepared the below chart based upon 25 hard copy documents selected at random from the government's production of hard copy materials.[11]  Because these 25 hard copy documents should be indicative of the type of terminology used to describe the expedited appointment process, it is reasonable to expect that similar terminology would have been used in responsive electronic documents.  Indeed, many of these documents are print-outs of documents that once existed in electronic form.

---

[11]   Defendants selected every 100th hard copy expedited appointment request that appeared in the government's production until a sample set of 25 was achieved.

The chart indicates that <u>none</u> of the 25 responsive documents contain one of the search phrases used by the consulate. *See* 5/29/07 Email (**Ex. 11**). In other words, had these documents existed only in electronic form, none of them would have triggered a "hit" and none of them would have been produced—despite the fact that they clearly are responsive. *See* **Ex. 14** (copy of documents referenced in below chart) (filed under seal).

| Bates Number(s) | Contains Search Phrase Used By Consulate Per May 29, 2007 Email? | Actual Subject Matter Term(s) Contained in Document |
|---|---|---|
| TOR_0000813-14 | No | "Expedited Appointment" (2x)<br>"expedite my appointment" |
| TOR_0001156-57 | No | "emergency appt"<br>"emergency appointment" (3x) |
| TOR_00001494 | No | "Emergency Appointment" (3x)<br>"unexpected visit" |
| TOR_0001822 | No | "emergency case" |
| TOR_0002241 | No | "earlier interview date"<br>"expedited appointment" |
| TOR_0002649 | No | "expedited appointment" (2x) |
| TOR_0002977-78 | No | "new appointment"<br>"earlier appointment" |
| TOR_0003366 | No | "EXPEDITED NONIMMIGRANT VISA APPOINTMENT"<br>"earlier appointment" |
| TOR_0003673 | No | "Emergent request"<br>"emergency visa (F1) appointment" |
| TOR_0004099 | No | "URGENT VISA APPOINTMENT"<br>"expedited appointment" |
| TOR_0004540 | No | "URGENT VISA"<br>"appointment at the earliest" |
| TOR_0004973 | No | "EMERGENCY VISA APPOINTMENT"<br>"emergency us visa appointment" |
| TOR_0005375 | No | "expedited nonimmigrant visa" |
| TOR_0005889-90 | No | "Rush" |
| TOR_0006281 | No | "emergency" (2x) |

| Bates Number(s) | Contains Search Phrase Used By Consulate Per May 29, 2007 Email? | Actual Subject Matter Term(s) Contained in Document |
|---|---|---|
| TOR_0006643 | No | "Expedited Visa appointment" |
| TOR_0007036 | No | "Expedited Visa Interview" (2x) "expedited appointment" (2x) "expedited visa appointment" "expediting my interview" |
| TOR_0007404 | No | "Expedite the case" (2x) |
| TOR_0007829-30 | No | "emergency US visa" (2x) |
| TOR_0008257 | No | "emergency US visit visa" |
| TOR_0008659 | No | "unexpected need to travel for business purposes" "urgent request for an interview" |
| TOR_0009098 | No | "early VISA appointment" |
| TOR_0009499 | No | "earlier appointment" |
| TOR_0009929 | No | "URGENT U.S. Tourist Visa application appointment" |
| TOR_0010337 | No | "emergency temporary visa" |

The search terms used by the government in this case are not only inconsistent with the order of this Court, they are inconsistent with the terminology used in the pleadings and correspondence in this case, and the consulate's own terminology. For example, a brief review of the pleadings in this case located no instance in which defendants or the government have ever used any of the four search phrases "early appointment," "early interview," "expedite appointment," or "expedite interview" to describe or discuss the expedited visa interview process. Moreover, Ms. Petrovich—who approved and supervised the use of these specific search phrases—does not use those terms herself. *See* Petrovich 1st Decl. (**Ex. 7**) (using the terms "expedited appointment," "expedited appointments," "scheduling appointments," "expedited non-immigrant visa interviews" to describe the process). Given that defendants suggested specific search terms that the government refused to adopt, it is difficult to imagine a good faith basis for the selection of the limited and restricted search conducted in this case.

It is troublesome that government selected phrases that would not have "hit" on obviously responsive material—especially considering that (1) the consulate knew the electronic documents were critical to the defense, *see, e.g.*, Defs' Post-Hearing Mem. at n.2 (March 24, 2007) ("The documents … that have yet to be produced are critical to the impeachment of Mr. Schimmel and other witnesses, as well as to the cross-examination of the government's expert witness.")  [Docket No. 45]; (2) the lost material likely contained crucial evidence regarding "remedial" changes the consulate made to its expedited appointment "practices" after the original Indictment was issued, *see* 3/21/07 Ltr. from B. Johnson, at 3 (**Ex. 5**) ("[T]he Toronto consulate's published expedited visa policy was changed on or about August 2006"); and (3) the consulate avoided State Department scrutiny by affirmatively deciding not to involve the State Department's CIF group to assist in the searches, despite CIF'S expertise and its prior involvement in searching for and securing the documents that the government believed were important to its case-in-chief, *see* Gov't Opp. at 14 [Docket No. 39].

At bottom, and for whatever reason, the government did not undertake the "thorough and complete searches of . . . electronic files" that was ordered by the Court.  In fact, it is difficult to imagine a more "narrow or parsimonious" view of a party's discovery obligations. *See Safavian*, 233 F.R.D. at 19 (government obligation to undertake  search that is comprehensive and reasonably calculated to produce all responsive materials).  *See Safavian*, 233 F.R.D. at 19.

### (vi)    The Toronto consulate did not search the correct locations for former employees.

Mr. Furtado explained that when a consular officer is transferred to another post, the consular officer continues to have access to his or her same account and existing "Toronto" email, but the Toronto consulate no longer has the ability to search that email.  The consular officer's new post would have to perform any email searches.  *See supra* Section I.H.2.  Ms.

Petrovich's Declaration states that the consulate searched the electronic files of several former consulate employees, including Lindsay Henderson, James Jewett, Susan Lively, Penny Rogers, Sarah Sexton, Michael O'Keefe, and Michael Schimmel.  Petrovich 1st Decl. at ¶¶ 6-7 (**Ex. 7**). But according to Mr. Furtado, that statement could not be correct because the Toronto consulate could not perform that search, and the search was not performed at other consulates.  Because the government failed to search the appropriate location for documents created by former employees—including very crucial participants like Mr. Schimmel[12]—those documents are now lost.

### (vii)    *The Toronto consulate never consulted with State Department's Computer Investigations and Forensics Branch ("CIF")*

Mr. Long was never asked to consult with the State Diplomatic Security Service, Computer Investigations and Forensics Branch ("CIF") regarding the electronic searches, despite CIF's prior involvement in the case.  If the Toronto consulate had exercised the same diligence in responding to the Court's order that it did in collecting and preserving the evidence it wanted for its case-in-chief, it is probable this motion would have never been necessary.  *See supra* Section I.A.

\*\*\*\*\*

In sum, information technology personnel at the consulate have confirmed that Ms. Petrovich's Declarations are false in material respects.  Ms. Petrovich's Declarations clearly admit what the consulate believed *would* constitute a reasonable and thorough electronic search to comply with the April 27 Order (*i.e.*, search "all email and stand-alone electronic documents"

---

[12] Mr. Schimmel was the Unit Chief of the Non-Immigrant Visa Section during May 2004 through September 2006. (He was also the Acting Chief of the Consular Section from August – November 2005.)  In that capacity, Mr. Schimmel set the expedited appointment "practices" at the consulate.  The record over the last 18 months strongly indicates that Mr. Schimmel intentionally misrepresented those "practices" in this case in order to conceal exculpatory and impeachment evidence.  *See* 1/23/06 Ltr. from B. Johnson at 4 ("it would have been highly unusual for any other officer to rule on [expedited appointment] request[s]") [Motion to Compel, Docket No. 35, Ex. 1]; *see also* **Ex. 3**.

on all "shared drives, personal drives and hard drives" for 24 consulate personnel who "approved or scheduled expedite non-immigrant visa interviews, or who played a role in the process," etc.). As demonstrated, however, the consulate did not actually do what it believed was required. Moreover, it covered up its known failures by making misrepresentations to the Court.

### C.    The Government Has Violated Defendants' Due Process Rights

#### 1.    The *Brady* Standard Applies

There is no issue regarding the materiality of the lost evidence.  *Cf. United States* v. *Caicedo-Llanos*, 960 F.2d 158, 161-62 (D.C. Cir. 1992).  The Court's orders have decided that issue.  *See, e.g.*, *supra* note 7.  Moreover, given what defendants and the Court have learned about the expedited appointment process to date, there is compelling evidence that the documents destroyed were exculpatory.  *See Brady*, 373 U.S. 83 at 87 (1963); *Youngblood*, 488 U.S. at 57-58 ("The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.").

*First*, this Court already has acknowledged the potential exculpatory value of the evidence.  *See supra* Sections I.C-D.  *Second*, the record suggests that the government repeatedly has dragged its feet and only begrudgingly and belatedly set out to collect and produce the documents.  When the information sought is within the control of the government, such conduct supports an inference that the evidence is not helpful to the government's case.  *See, e.g.*, *United States* v. *Marshall*, 1997 U.S. App. LEXIS 16307, at *4-5, (D.C. Cir., 1997).  *Third*, the government actually stands to benefit from its production failures by arguing that no conclusions can be drawn about the expedited appointment process from the existing documents.  *See, e.g.*, 1/22/07 Ltr. from B. Johnson ("consular offices … may or may not keep records, faxes, letters, etc. regarding requests for expedited visa interviews")[Motion to Compel, Ex. 1, Docket No. 35].

29

*Finally*, the evidence shows that the expedited visa process was not only an "informal" one, but that virtually every person or company that requested an expedited business appointment received one. There could not be a more stark contrast with the theory of the Indictment that Mr. Agrawal bribed Mr. O'Keefe to violate existing procedures and grant the expedited appointments. Yet, the searches here were conducted or supervised by Ms. Petrovich—one of the very individuals who might have been impeached (or at least embarrassed) by the documentary record.

The value of the lost evidence—both to demonstrate the routine nature and informality of the expedited appointment process and to impeach government witnesses—is incalculable. In fact, the evidence was directly exculpatory on both the element of corrupt intent and the extent to which granting an expedited visa is an "official act." The loss of this evidence violates due process regardless of whether the government acted in good or bad faith.

## 2. Even Under the *Arizona* v. *Youngblood* Standard, The Government Has Violated Due Process

Even if the *Youngblood* standard applies, "[t]he presence or absence of bad faith … for purposes of the Due Process Clause must necessarily *turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed*." *In re Sealed Case*, 99 F.2d 1175, 1178 (D.C. Cir. 1996) (emphasis added).[13]

*First*, the government failed to take steps to preserve material evidence—including simply informing consular employees through a preservation notice to stop destroying documents—even after it first had knowledge of the potential exculpatory value of the evidence on December 22, 2007. *See, e.g.*, *Treppel* v. *Biovail Corp*. no. 03 Civ. 3002, 2008 WL 866594, at *5-7 (S.D.N.Y. April 2, 2008) (citing cases). Standing alone, the failure to take any steps at

---

[13] *See, e.g.*, *Virgin Islands* v. *Fahie*, 419 F.3d 249, 256-257 (3d Cir. 2005) (bad faith/willfulness includes recklessness and deliberate indifference) (citing cases).

all to preserve the evidence called for by the April 27 Order is an indication of bad faith.  *See,*

*e.g.*, *Miller*, 2007 WL 172327, at *6; *Zubulake*, 229 F.R.D., at 431-32 ("Once a party reasonably

anticipates litigation, it must suspend its routine document retention/destruction policy and put in

place a "litigation hold" to ensure the preservation of relevant documents.");  *Broccoli* v.

*Echostar Comm. Corp.*, 229 F.R.D. 512 (M.D. 2005) (finding "bad faith in … failure to suspend

its email and data destruction policy or preserve essential personnel documents."  Moreover, the

government's failure to act violated its own regulations.  *See* 5 FAM § 476 ("The Office of the

Legal Advisor must be informed of requests for records or information connected with

litigation….  *Maintain these records separately to avoid inadvertent disposal and label them*

*with Form DS-1851, Hold for Litigation*.") (emphasis added).

      *Second*, the time and expense of preserving the documents would have been

minimal.  The evidence in this case could have been preserved by issuing a document

preservation notice, by pulling email and network server backup tapes out of circulation (or

taking an electronic "snapshot" of the email and server data), and by imaging key individuals'

computer hard drives.  *See* Harrison Decl. at ¶¶ 10-11, 24 ("It would have been a trivial and

inexpensive task to simply remove one or more of the backup tapes") (**Ex. 3**).  Assertions that

the only way to preserve relevant data would have been "[to freeze] all of the systems on which

the electronic searches were conducted at the time the systems were searched" simply are wrong.

*Compare id*. *with* 4/18/08 Ltr. from B. Johnson (**Ex. 2)**.  The United States government—

including the Department of Justice—routinely, indeed daily, requires citizens to take steps to

preserve all documents in response to subpoenas and document requests.  *See also* Department of

Justice Grand Jury Subpoena (**Ex. 1**); *see also Holzmann*, 2007 WL 172327, at *6 ("obligation to

preserve electronic data requires reasonable good faith efforts") (quoting *The Sedona*

*Conference, Best Practice Recommendations & Principles for Addressing Electronic Document Production*, 44 (2004 Annotated Version)).

       *Third*, to the extent (as the Indictment contends) the granting of an expedited appointment is an "official act" or decision of a U.S. government official, then failure to preserve documents reflecting such decisions violated the law.  *See* Superseding Indictment, Count 2 ("official acts, that is, the expediting of the handling of applications for visas").  The Federal Records Act ("FRA") requires that the State Department "preserve records containing adequate and proper documentation of the … *policies, decisions, procedures* … necessary to protect the legal and financial rights of … persons directly affected by the [State Department's] activities." 44 U.S.C § 3101; *see also* 5 FAM § 413.  All documentary and electronic materials made by the State Department "in connection with the transaction of public business … [that are] appropriate for preservation … as evidence of *... policies, decisions, procedures, operations, or other activities*" are subject to the FRA.  *See* 44 U.S.C. § 3301; 5 FAM § 415.1.[14]  Federal records cannot be destroyed except in accordance with the procedures in U.S. Code, Title 44, Chapter 33.

       *Fourth*, the government's pervasive "reluctant and recalcitrant behavior" with respect to its discovery obligations and the Court's April 27 Order "does not satisfy the good faith standard to which the government must adhere when faced with a court order."  *United States* v. *Hastings*, 126 F.3d 310, 317 (4th Cir. 1997).  The government's pattern of resistance to any discovery that is inconsistent with their views of the case tends to support a finding of bad faith.  *See United States* v. *Morrision*, 449 U.S. 361, 365 at n.2.[15]

---

[14] *See also* 5 FAM 441 (Electronic Records Management); 5 FAM 442 (Facsimile Records); 5 FAM 443 (Electronic Mail (E-mail) Records).

[15] *See* **Ex. 3**.  For example, in addition to the document production issues, the government offered and then declined to make Canadian citizen witnesses (and U.S. government employees) available for interview.  *See* Docket Nos. 58-59, 61-64, 68, 74, 81 for the history of this issue.  Moreover, even after defendants prevailed on Rule 16 motions and obtained letters rogatory from the Court, the government again raised objections to the Court's orders and the

*Finally*, the government has misrepresented to this Court the steps taken to comply with the April 27 Order. These misrepresentations—which would not have been uncovered without the forensic work by defendants and their expert—also rise to the level of bad faith. *United States* v. *Benlizar*, 459 F. Supp. 614 (D.D.C. 1978) (Court of Appeals reversed defendant's conviction because systematic refusal to respect defendant's constitutional and statutory rights and attempts to perpetuate fraud on the court).[16]

## III. THE APPROPRIATE REMEDY FOR THE GOVERNMENT'S DUE PROCESS VIOLATIONS IS DISMISSAL OF THE INDICTMENT

Over the last year-and-a-half, the Government has fought every step of the way to minimize and delay its discovery obligations. Now, the loss of *Brady* evidence jeopardizes defendants' ability to defend themselves. As the evidence regarding the routine and unofficial nature of the expedited appointment process started to trickle out and undermine the bribery theory of the original Indictment, the United States responded by returning a superseding indictment which has broadened the theory of the case by alleging that both the expedited appointments and the issuance of the visas themselves were the subject of the alleged bribes. (*See supra* note 15 and accompanying citations.) The action of the United States in returning a superseding indictment—and effectively abandoning the theory that Mr. O'Keefe was bribed by Mr. Agrawal to expedite appointments—is indisputable evidence that the discovery sought was not only exculpatory, but powerful. But, coming at this late date, it also is clear that additional discovery regarding the expanded theory of the indictment would be relatively fruitless. By the

---

deposition of the witnesses in Canada. *See* 2/20/08 Ltr. to B. Johnson (**Ex. 15**); 2/28/08 Ltr. from B. Johnson (**Ex. 16**); 2/29/08 Ltr. to B. Johnson (**Ex 17**).

[16] It is almost certainly the case that counsel for the United States were not directly involved in the searches conducted at the consulate and therefore did not have any reason to know that the representations made in the Petrovich declarations were untrue when they were filed. Nevertheless, the United States as a whole had an obligation to conduct a thorough and diligent response to the court-ordered discovery, and counsel for the government have a duty to supervise the document collection and to investigate production issues raised by defendants. *See Zubulake*, 229 F.R.D. at 432-33. Thus, whether the State Department or the Justice Department violated the court's order is inconsequential; as a matter of law, the effect is just as prejudicial to the defendants.

government's own admission, electronic documents relating to the issuance and expediting of the visas—and to the *de facto* policies, procedures, and practices of the Toronto consulate—have been destroyed. *See, e.g.*, LaFeve, Criminal Procedure § 20.6 ("If evidence is destroyed for the very purpose of hindering the defense, such conscious impropriety creates an inference … that the matter was *Brady* material) (citing *People* v. *Hitch*, 527 P.2d 361 (Cal. 1974)).

Dismissal of an indictment (or reversal of a conviction) is warranted when the government knowingly makes evidence unavailable in a manner that prejudices defendants' constitutional rights, including by destroying *Brady* material. *See United States* v. *Benlizar*, 459 F. Supp. 614 (D.D.C. 1978) (D.C. Circuit reversed conviction because of non-compliance with "judicial admonitions"; "misleading testimony before th[e] Court"; "failure to preserve discoverable evidence"; and "destruction of crucial evidence"); *United States* v. *Chapman*, 524 F.3d 1073 (9th Cir. 2008) (affirming dismissal of indictment for improperly managing discovery, failing to produce material documents, and making misrepresentations to the court); *United States* v. *Dollar*, 25 F. Supp. 2d 1320, 1332 (N.D. Ala. 1998) (dismissing charges because government "breached the duty of professionalism and candor owed to the court"); *see also United States* v. *Graham*, 2008 WL 2098044 (S.D. Ohio May 16, 2008) (dismissing indictment on Speed Trial Act grounds because of lengthy delays and problems with the government's voluminous discovery).[17]

---

[17] *United States* v. *Graham*, 2008 WL 2098044 * 5:

> In this case, the problem, as the parties well know, is and has been discovery. The discovery itself breaks down into three separate problems. One, the volume of discovery in this case quite simply has been unmanageable for defense counsel. Two, like a restless volcano, the government periodically spews forth new discovery, which adds to defense counsels' already monumental due diligence responsibilities. Three, the discovery itself has often been tainted or incomplete…. Indeed, it appears that these issues may require yet another continuance of the trial if the indictment is not dismissed.

> This has put the Defendants in an untenable position. They have not been able to effectively prepare for trial because of all the issues surrounding discovery, but despite the numerous continuances in this matter, by all appearances the case is not much closer to being ready for trial

If the tables were turned, there is no question that a private party who responded to a Grand Jury subpoena in this fashion would have every legitimate reason to be concerned about obstruction of justice charges.  *See* Department of Justice Grand Jury Subpoena (**Ex. 1**); *United States* v. *Arthur Andersen*, 374 F.3d 281 (5th Cir. 2004).  In this case, dismissal is the only remedy available to adequately address the prejudice to defendants.

## IV.     CONCLUSION

For all of these reasons, defendants respectfully request that the Court hold that the government's noncompliance with the Court's orders, its loss and destruction of exculpatory evidence, and its misrepresentations to the Court have prevented defendants from receiving a fair trial.  Accordingly the Court should dismiss the Indictment with prejudice.

Dated:  June 6, 2008                              Respectfully submitted,


                              _____/s/_____
                              Thomas C. Green (D.C. Bar #14998)
                              Mark D. Hopson (D.C. Bar #394338)
                              David J. Ludlow (D.C. Bar #489136)
                              SIDLEY AUSTIN LLP
                              1501 K Street, NW
                              Washington, DC 20005
                              *Counsel for Defendant Sunil Agrawal*

                              _____/s/_____

                              Bernard S. Grimm
                              COZEN O'CONNER
                              The Army and Navy Building
                              1627 I Street, N.W. Suite 1100
                              Washington, D.C. 20006
                              *Counsel for Defendant Michael John O'Keefe*

---

now than it was in December of 2006.  Hence, they have faced a lengthy delay in resolving the charges filed against them. There does not seem to be a reasonable time on the horizon within which this case might be brought to trial.  Therefore, since December 5, 2006, the Court has essentially continued this trial indefinitely.  On that basis alone, Defendants' Speedy Trial rights have been violated.