## DECLARATION

I, Brett D. Harrison do hereby state as follows:

1.      I am now, and have been since September of 2006, a Director in FTI Consulting's (FTI) Washington, DC, Electronic Evidence Consulting practice.  As a Director, I lead efforts involving the collection and forensic processing of electronic information.  Since joining FTI, I have managed and participated in the collection and forensic processing of data collected pursuant to many significant matters.  I have worked to streamline FTI's collection and forensic processing methodologies and I am a member of FTI's forensic standards committee.  Since joining FTI, I have conducted in-depth computer forensic examinations of numerous high value computers of interest.  I have provided expert Declarations and have also provided expert Deposition support to firms in order that they may more thoroughly explore the testimony provided by opposing experts.

2.      Prior to my employment with FTI, I was employed by the Federal Bureau of Investigation's Computer Analysis Response Team (CART) Unit in Washington DC.  The FBI's CART Unit is responsible for the forensic acquisition and processing of all computers which are seized by the FBI.  During my fifteen year tenure with the FBI and specifically during my seven year tenure with the CART Unit, I worked as both a certified Forensic Examiner of computer evidence and as a Program Manager.  As a computer Forensic Examiner, I conducted acquisitions and forensic examinations of a wide range of computers to include laptops, desktops and servers as well as computers which utilized both Windows and UNIX operating systems. Subsequent to my certification as a Forensic Examiner, I served as a Program Manager within the CART Unit and was responsible for ensuring that the FBI's 400 Forensic Examiners of computer evidence had the necessary knowledge, skills and tools required to perform specific forensic examinations.  As a Program Manager, I also focused on leading the development of custom and semi-custom forensic tools so as to allow the FBI's Forensic Examiners to accurately collect preserve and process computer systems. I developed portions of the CART Unit's basic training curriculum for new examiners as well as portions of the advanced training curriculum used for senior examiners.  I routinely led training programs in these areas.  I also assisted in drafting portions of the FBI's computer forensic Standard Operating Procedures.

3.      With respect to this particular matter, I have participated in informal telephone conversations with Toronto Information Management staff members Gil Furtado and John Long. Gil Furtado was initially represented by the Government as being the specific individual on the Toronto Consulate's Information Management Staff that conducted searches of the email system, personal computers and network storage drives.  Additionally, I have reviewed the Declarations provided by Peggy Petrovich on October 27th, 2007 and on March 4th of 2008, respectively.  I have also reviewed the electronic files which were produced by the Toronto Consulate on three CDROMs, the letter received from the United States Department of Justice (DOJ) dated April 18th, 2008 and the May 29th, 2007 email from Gil Furtado to John Long.

4.      The field of electronic discovery or "e-discovery" is well established and its "best practices" have been widely documented by groups such as the Sedona Conference and the DOJ[1].  The sources of electronic information which are typically searched as well as the common processes and procedures which are employed for gathering and searching that information are widely agreed upon by the field's experienced practitioners.  In many matters, appropriate computer forensic experts are retained to identify, search, preserve and process the data in an industry accepted fashion.  The State Department does in fact have a Computer Investigations and Forensics Branch which was used to preserve and process Mr. O'Keefe's computer during the pre-indictment investigation. However, there are no indications that the Branch was consulted

---

[1] Reference is made to a document published in April of 2004 by the Department of Justice, National Institute Justice titled "Forensic Examination of Digital Evidence: A Guide for Law Enforcement"

1

or utilized for the general identification, preservation and processing effort in connection with the court's April 27th, 2007 discovery order.

5.      The first area that should be explored when initiating an e-discovery effort is to properly define the scope of the effort. This begins with preparing a list of possible information sources, preparing a list of key custodians and then making intelligent decisions regarding the best method of collecting and analyzing the electronic information. Best results are obtained when the results of this first step are reviewed with all parties. It is not known whether this crucial first step was properly performed. There are no indications that it was.

6.      The sources of electronic information which are typically available are those related to server based email, personal computer based email, electronic files stored on personal computer hard drives, electronic files stored on network hard drives, electronic files stored on removable media such as CDROMs and archived data for all of the aforementioned sources. Each of these sources must be considered when determining the scope of an electronic collection effort. At the onset of a typical preservation effort, a preservation notice is circulated to all appropriate custodians formally directing them to cease the deletion or destruction of all information and documents related to the referenced matter.  Based on my discussions with Toronto Information Management staff, there is no indication that a preservation notice was circulated in this matter.

7.      With respect to the identification, searching, preservation and collection of electronic information from personal computers; there are industry accepted methods which should be used. The methods vary in the extent to which they identify and preserve all active files, selected active files, deleted files and metadata[2].

8.      With respect to the identification and searching of responsive files, the most comprehensive technique involves the use of specialized forensic software. Such forensic software allows for the comprehensive identification and searching of both active and deleted files and offers the greatest likelihood of viewing the various types of files. (i.e. not all software can open all types of files) In the event that the use of proper forensic software is not deemed necessary, the proper use of the Windows searching features may be adequate; however its lack of ability to search certain file types needs to be considered. Additionally, keyword searching is not as simple a process as one might assume. The crafting of the keywords or key phrases is critical. The use of wildcard characters is also very powerful; however, when not properly implemented will produce incomplete results. Further, utilizing only the Windows searching feature may limit the effectiveness of the search by precluding proximity, Boolean, stemming, context, and fuzzy searching techniques.

9.      With respect to the preservation and collection of electronic information, the "gold standard" is a process known as "forensic imaging[3]." Forensic imaging allows for the perfect preservation of all active files, deleted files and metadata at the time when then forensic image is created. Such preservation allows for the assurance of authenticity and for subsequent searching of the preserved data in an iterative and effective fashion. The forensic imaging process is typically performed by trained professionals. The decision to perform forensic imaging should be based on the outcome of discussions between the parties and also after consultation with forensic experts. Other less forensically complete preservation options such as the creation of logical image files, the use of Windows Backup software and possibly even use of standard Windows copy functions may be adequate; however their limitations should be carefully recognized.

---

[2] Metadata is commonly defined as information about information. Typical examples include the time and date stamps associated with files as well as information about the author of a document, etc.

[3] Forensic imaging is the process of creating a complete copy of all data contained on a piece of computer media.

10.     The DOJ letter dated April 18th, 2008 clearly states that "none of the six posts froze all of the systems on which the electronic searches were conducted." The letter also states that the data on the Toronto computer systems is backed up to tape which means that it could have easily been "frozen" or preserved. It would have been a trivial and inexpensive task to simply remove one or more of the backup tapes from the weekly rotation of tapes thereby preserving the data at that point in time. The cost of a backup tape is roughly $100 and it takes a matter of seconds to remove one or more tapes from a backup system.

11.     Based on my review of this matter and my discussions with Toronto Information Management staff, the only personal computer hard drive on which data was properly preserved was the one belonging to Michael John O'Keefe and it was done so in conjunction with the pre-indictment investigation. In my opinion, due to the fact that email data and electronic documents can also be stored on a user's personal computer hard drive, it would have been prudent to forensically image the computers belonging to other key custodians or to at least complete some preservation of the data so as to facilitate subsequent searches.

12.     With respect to the collection of electronic information from shared network hard drives, the most common collection methodology is to collect all of the active files which are contained on the network drive for either all custodians or for selected key custodians. It is quite common to collect all of the files unless the volume of data makes such collection prohibitive. Collecting all of the files allows for future searches and refinements to the search criteria. Based on my review of the work performed pursuant to this matter, it does not appear that any files were collected or searched by the Information Management personnel from shared network hard drives.

13.     With respect to the collection of electronic information from network email servers, the most thorough method of collection is to gather all of the email from both the email server and appropriate backup tapes as well as from locally stored email folders on each custodian's personal computer or network storage drive. Following the proper collection of the email and through the use of appropriate forensic software, searches of the email messages as well as their attachments can be performed. When email data is properly collected, subsequent searches can be performed in an iterative fashion so as to increase the effectiveness of the process. In this matter, several areas were not searched. Later in this Declaration, I will discuss my conversation with Information Management staff member John Long and will address the shortcomings of the email collection and searching process which was actually performed in this matter.

14.     I have reviewed the two Declarations provided by Peggy Petrovich on October 27th, 2007 and on March 4th of 2008. In those Declarations, she makes many unsupported statements regarding the collection and searching of email and electronic files. Later in this Declaration, I will identify each of her unsupported statements and provide comment. The Government advised that the identification, collection and searching of email and electronic files was done primarily by Information Technology Program Officer Gil Furtado, who was a member of the Toronto Consulate's Information Management staff. Accordingly, I requested access to the Mr. Furtado and a conference call was arranged.

15.     On April 9th, 2008, I was afforded the opportunity to speak with Mr. Furtado via telephone regarding the searches which he performed. During our conversation he indicated that he was retired and that he had not actually performed the searches. He indicated that he was a supervisor and that he had requested that the searches be performed, however the actual searches had been performed by Toronto Consulate employee John Long who was in fact still employed by the Toronto Consulate. I did not ask many other questions of Mr. Furtado. Accordingly, I asked for permission to speak with John Long.

16.     On April 23, 2008, I was afforded the opportunity to speak with Toronto Consulate Computer Management Assistant John Long via telephone regarding the searches

which he personally performed.  Mr. Long indicated that that he did not have any formal or informal training in the fields of computer forensic or electronic discovery.  He stated numerous times that he had only done what was specifically asked of him.

17.     I asked Mr. Long to explain in general terms what he had been asked to do?  He indicated that Mr. Furtado had asked him to search the email of specific individuals using four specific search terms; "early appointment", "early interview", "expedite appointment" and "expedite interview".

18.     I asked if he could identify the specific electronic sources of email information which he had searched.  He indicated that to the best of his recollection, he had searched only the server based email for specific custodians from the Toronto Consulate.  He stated that he had not searched through any email folders or archives which were stored on any custodian's personal computer hard drive or network storage drive.  He acknowledged that all users at the Toronto Consulate have the ability to store email messages on their personal computer's hard drive and/or network storage drives and that many in fact do.

19.     By his own admission, Mr. Long stated that he did not believe that his searches of email would have identified instances of the search terms occurring within any email attachments.  He further stated that he did not use "wildcard" characters in any of his searches.

20.     Upon completion of our conversation, I asked Mr. Long if he had any notes or reports which could be used to refresh or re-enforce his memory; he stated that other than one email message, he did not.  That email message was subsequently produced on May 15th, 2008.

21.     I have reviewed the two Declarations provided by Peggy Petrovich on October 27th, 2007 and on April 4th of 2008.  Ms. Petrovich makes multiple statements in her two Declarations which I find troubling and which are contradicted by the physical evidence which has been produced and by my conversations with Gil Furtado and John Long.  Listed below are specific excerpts from her two Declarations followed by my concerns with each.

22.     In her October 27th Declaration Ms. Petrovich states:

*"The parameters of the electronic search included all email and stand–alone electronic documents, e.g. documents prepared on our office software applications, regarding expedited appointments located on shared drives, personal drives and hard drives for all consular officers and locally engaged staff…"*

Mr. Long stated during our conversation that he performed no searches of electronic documents on local computer hard drives or on network storage drives.  Further, based upon my review of the physical evidence provided, there is no indication that those searches were performed by anyone else.

*"For the email and stand-alone electronic document searches, we used the following search term parameters: "early or expedite* or appointment or early & interview or expedite* & interview."  The Information Management staff conducted the search of personal and hard drives because they have access to all drives from the network server, not just shared drives."*

Based on my discussion with Mr. Long it is apparent that the Information Management staff performed searches of email messages only and that the search terms which they used were poorly constructed.  The search methodology would not have identified all relevant email messages or attachments.  Mr. Long specifically stated that he did not search computer hard drives or network storage areas and he stated that no forensic images were created and that no specific preservations of the data were attempted.

4

*"No responsive documents were located during a search of the hard drives of Mike Schimmel, the previous visa unit chief, Peggy Petrovich, the current visa unit chief; Pat Haye, the visa assistant who has main responsibility for processing expedited appointment requests; and Jane Boyd, the visa assistant who has main responsibility for scheduling appointments for diplomatic and official applicants. In addition, no further responsive stand-alone documents were found in any shared drives."*

Based on my discussion with Mr. Long and my review of the materials which have been provided by Counsel, there is no indication that the appropriate searching of personal computer hard drives or network shared drives was performed. A small number of scanned documents was provided; however, there is no way to determine the method by which they were identified or a way to identify their origin. One CDROM was provided which indicates that it contains "native files[4];" however, it in fact contains only email messages. No other "native" electronic files. It would appear that possibly some files were identified by individual Toronto Consulate personnel, printed and then scanned. If that is the case then it is contrary to Ms. Petrovich's Declaration which states *"the Information Management staff conducted the search of personal and hard drives because they have access to all drives from the network server not just shared drives."* Mr. Long indicated that he performed no such searches.

23.    In her April 4th Declaration Ms. Petrovich states:

*"Toronto's Information Management staff conducted an electronic search for responsive material maintained in the electronic files or folders of the following LFS: Jane Boyd, Althea Brathwaite, Rose Castro, Maribel Ebona, Maria Erlindson, Pat Haye, Michael Niles and Janice Thompson."*

Based on my conversations with Gil Furtado and John Long, no such searches were performed. Perhaps these searches were performed by a person who has yet to be identified?

*"Toronto's Information Management staff conducted an electronic search for responsive material maintained in the electronic files or folders of the following Foreign Service officers and U.S. citizen employees...."*

Based on my conversations with Gil Furtado and John Long, no such searches were performed. Again, perhaps these searches were performed by a person who has yet to be identified?

24.    It is quite apparent that the preservation and searching efforts which were performed by the Toronto Consulate were informal, unstructured and not well implemented. The preservation effort was not performed to commonly accepted standards within the e-discovery field and for the most part did not occur at all. A proper preservation effort in this matter would not have required that the Consulate remove its computer systems from service. Forensic imaging of the personal computers used by selected custodians or at least the completion of some acceptable preservation effort was certainly warranted. Many of the searches which were represented to have been performed do not appear to have actually occurred. My conversations with Mr. Furtado and Mr. Long make it quite clear that no searches of personal computer hard drives or network shared drives were performed by the Toronto Consulate's Information Management staff as was represented by Ms. Petrovich. It is my opinion that the failure to properly preserve electronic documents and the failure to properly search for responsive electronic documents is particularly egregious given that the State Department has a very

---

[4] Native files are electronic files which are provided in their original format. For instance a native Excel spreadsheet file would be provided in .xls format as opposed to being provided in a .tif graphic file format. Native files can contain metadata which is not available once files are converted to another format.

competent computer forensic group which could easily have been employed or consulted. Based on my knowledge of the Consulate's computer systems, an intelligent preservation effort would not have incurred excessive cost or been unduly burdensome.

I declare under penalty of law that the foregoing is true and correct to the best of my knowledge and belief.

6/6/08

Brett D. Harrison
Director, FTI Consulting
1201 Eye Street NW
Suite 300
Washington, DC 20005