## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO. 1:06-CR-00249 (PLF/JMF)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **MICHAEL JOHN O'KEEFE, Sr.,** | **:** | |
| **SUNIL AGRAWAL,** | **:** | |
| | **:** | |
| **Defendants** | **:** | |


### GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully opposes Defendant Sunil Agrawal and Defendant Michael John O'Keefe, Sr.'s joint motion to dismiss. The defendants allege that because the government failed to preserve electronic data they characterize as "evidence favorable to the accused" under Brady v. Maryland, 373 U.S. 83, 87 (1963), their due process rights have been violated, and this case should be dismissed. This motion is without merit and should therefore be denied. In support of this Opposition, the government states the following:

### I. BACKGROUND

On September 1 and September 27, 2006, respectively, Defendant O'Keefe and Defendant Agrawal were arraigned on an Indictment charging each of them with one count of conspiracy, in violation of 18 U.S.C. § 371, and two counts of bribery, in violation of 18 U.S.C. §§ 201(b)(1) and (2). On April 15, 2008, the defendants were arraigned on a Superseding Indictment containing the exact same counts.[1] As set forth in Count 1 of the Superseding Indictment, the

---

[1] The government decided to seek a superseding Indictment in order to remove any alleged ambiguity about the scope of the defendants' conduct. The government filed a memorandum outlining all of the changes between the original Indictment and the Superseding Indictment on March 25, 2008 [Docket No. 99].

objects of the conspiracy were for Defendant O'Keefe to receive personal benefits in exchange

for expediting visa interview appointments[2] and/or issuing visas to benefit Defendant Agrawal

and his business and for Defendant Agrawal to obtain expedited visa interview appointments and

the issuance of visas for his employees and persons sponsored by STS Jewels, thereby saving

him, his business and his employees, time and money.  See Superseding Indictment at ¶ 9(A)-©.

The Superseding Indictment details how Defendant Agrawal and Defendant O'Keefe frequently

communicated with one another regarding the scheduling of expedited appointments and the

handling and issuance of visas for STS Jewels persons, as well as the provision of trips and

jewelry paid for by Defendant Agrawal and bestowed upon Defendant O'Keefe.

The government provided the defendants with their first discovery packet on October 2,

2006.[3]  Subsequently, in letters dated December 22, 2006, and January 5, 2007, Defendant

Agrawal requested, among other things, all documents regarding expedited visa appointments at

fifteen North American consulate and embassy locations.[4]   After the government notified

---

[2]        In order to obtain a visa to the United States from the U.S. consulate in Toronto,
where Defendant O'Keefe worked as a consular officer, a visa applicant must first schedule an
appointment to be interviewed.  The scheduling of the appointment is based upon the post's
waiting time, that is, the amount of time between when the applicant requests an appointment
and when a date is available for the interview, as well as whether an applicant's request for an
expedited appointment is approved by the consulate.

[3]        As the government has learned of new and/or previously undisclosed information,
it has sought to provide the defense with this information as quickly as possible.  As of this date,
the government has provided approximately fifty discovery letters and/or packets to the
defendants.

[4]        The following fifteen embassies and consulates were named in the defendants'
request:  Montreal, Canada; Ottawa, Canada; Toronto, Canada; Vancouver, Canada; Winnipeg,
Canada; Mexico City, Mexico; Ciudad Juarez, Mexico; Guadalajara, Mexico; Hermosillo,
Mexico; Matamoros, Mexico; Monterrey, Mexico; Nogales, Mexico; Nuevo Laredo, Mexico;
Puerto Vallarta, Mexico; and Tijuana, Mexico.

Defendant Agrawal of its opposition to providing this information, Defendant Agrawal filed a motion to compel discovery[5] on January 30, 2007, seeking, among other things, information from the U.S. Department of State regarding expedited visa interviews at the U.S. consulate in Toronto, as well as five other embassies and consulates. On February 9, 2007, the government filed a motion in opposition to the defense motion. A hearing on the matter was held on March 22, 2007.

On April 27, 2007, the Court ruled on the motion in a written Memorandum Opinion and Order. See United States v. O'Keefe, 2007 WL 1239204 (D.D.C. April 27, 2007) (hereinafter "April 27, 2007, Order"). As part of the Order, the Court stated that the government should file a letter that would inform the six embassies and consulates subject to the Order of their search and production obligations and that all of the parties agree on the contents of that correspondence prior to its dissemination. See id. at *4. Specifically, the Court stated, "To avoid later disputes, the text of the letter and a list of the addressees must be provided to the Court and to defense counsel in advance; counsel will have 72 hours to make suggestions and 72 hours after the government responds to those suggestions to interpose objections with the Court. This procedure is required not to create the potential for litigation over details but, rather, to encourage communication, accommodation and consensus in implementing the Court's decision without the need for further litigation over discovery." Id.

On May 7, 2007, the United States filed a notice to the Court with a copy of letters addressed to June H. Kunsman, Managing Director of the Visa Office at the Department of State, and to designated contacts at the consulates and embassies in Toronto, Canada; Ottawa, Canada;

---

[5]     Defendant O'Keefe joined the motion of Defendant Agrawal.

3

Matamoros, Mexico; Mexico City, Mexico; Nogales, Mexico; and Nuevo Laredo, Mexico,

advising all of the individuals of the Court's April 27, 2007, Memorandum Opinion and Order.

[Docket No. 51]. These letters detailing the expectations and giving parameters of the searches to

be conducted were approved by counsel for Defendant O'Keefe and Defendant Agrawal, as

directed by the Court, prior to the respective posts being formally notified of the Court's Order.

The approved May 7, 2007, letter, along with a copy of the Court's April 27, 2007, Order,

was disseminated to the six embassies and consulates by the Department of State. In deciding

how to best undertake the physical and electronic searches at the six sites named in the Order in

as timely a manner as possible, and taking into account logistics, resources, and the location of

responsive information, the Department of State designated to each embassy and consulate the

responsibility for conducting the searches.[6]

As each embassy or consulate began to produce responsive materials, the Department of

State provided the information to the United States Attorney's Office. The government thereafter

provided the materials received from the Department of State to the defense on a rolling basis.

The vast majority of responsive documents have involved specific requests for expedited

appointments by applicants – for instance, materials related to an applicant's request to the

Toronto consulate for an earlier appointment due to an impending business commitment or a

family emergency, and the action taken by the post on the request. The remaining type of

---

[6]     No centralized repository of electronic evidence exists at the Department of State.
Rather, each consulate and embassy's computer network is located on-site. The Department of
State Diplomatic Security Service, Computer Investigations and Forensics Branch ("CIF"),
which is located in the Commonwealth of Virginia, was consulted about conducting the
electronic searches at the six locations, but the government was told that CIF did not have
enough personnel or the resources to deploy out and dedicate to the electronic searches at the six
designated consulates and embassies.

documents provided have ranged from e-mails discussing proposed revisions to expedited visa application policies to responses to inquiries from the United States Attorney's Office regarding the existence of and search for responsive documents in the instant matter.

On October 7, 2007, Defendants filed a Joint Motion to Compel, directed at the form and format of some of the discovery received from the government. On October 26, 2007, the government filed an Opposition to the Joint Motion and attached a declaration of Peggy L. Petrovich, Visa Unit Chief at the Toronto consulate, in order to provide the additional clarification about the searches conducted at the consulate pursuant to the Court's April 27, 2007, Order (Declaration of Peggy L. Petrovich (October 26, 2007)) (hereinafter "Petrovich 1st Decl.") [Docket No. 78, Attachment B]. The Court issued an Order regarding the issues raised by Defendants on February 20, 2008. See United States v. O'Keefe, 537 F. Supp.2d 14 (D.D.C. 2008) (hereinafter "February 20, 2008, Order"). On March 4, 2008, the government filed a declaration from Ms. Petrovich further detailing the search conducted at the Toronto consulate in response to the Court's April 27, 2007, Order (Declaration of Peggy L. Petrovich (March 4, 2008)) (hereinafter "Petrovich 2nd Decl.") [Docket No. 92]. The government filed detailed declarations from representatives of the other five embassies and consulates providing similar details on March 14, 2008. [Docket No. 95, Attachments A-E].

The Department of State has devoted an enormous amount of time and resources to ensure compliance with the Court's orders and the defendants' many discovery requests. For instance, the Department of State hired at least eight full-time contractors to assist in search efforts for responsive hard copy responsive materials located at off-site storage facilities. Similarly, staff at the Toronto consulate spent over 160 work hours searching for and preparing copies of materials

to be transmitted in response to the Court's April 27, 2007, Order.  <u>See</u> Petrovich 1st Decl. at ¶ 2.

Over 200,000 pages of documents have been turned over to the defendants pursuant to the Court's April 27, 2007, Order.  The government has attempted to respond to Defendants' many requests for information about the search process and documents provided in a timely manner. The government provided copies of all of the electronic data received from the consulates in Toronto and Nogales, and the U.S. embassy in Mexico City, in the data's original formats, to the defendants.  In addition, at their request, the government also arranged for the defense telephone conferences with Wendy Sorley, an employee of NuComm International, an outsource call center that obtained the contract for scheduling non-immigrant visa appointments in Canada; John Long, Computer Management Assistant at the Toronto consulate; and Gilbert Furtado, the former Information Program Officer at the Toronto consulate who has since retired.   The government is also in the process of providing additional identifying information requested by the defense on thousands of documents produced by the Toronto consulate.

In an April 4, 2008, letter, Defendant Agrawal made six new requests for discovery pertaining to what was described as the government's "new" allegation in the Superseding Indictment that Defendant Agrawal had given things of value to Defendant O'Keefe in exchange for issuing visas to individuals sponsored by STS Jewels.  The government provided some of the information asked for by Defendant Agrawal but objected to the scope and breadth of the remainder of the request.  On June 13, 2008, Defendant Agrawal filed a Motion to Compel for much of the discovery requested in his April 4, 2008, correspondence [Docket No. 117].

## II.  ARGUMENT

Invoking <u>Brady</u> and <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988), Defendants now falsely

contend that the government has repeatedly violated the Court's February 20, 2008, Order and destroyed exculpatory electronic data maintained at the Toronto consulate regarding expedited visa interviews.  In a nutshell, Defendants argue that their due process rights were violated because more comprehensive electronic searches were not conducted and because the government failed to preserve all electronic evidence at the consulate so that such searches could be undertaken at the present time.

Responsive electronic documents from the Toronto consulate have been provided to the defense.  The type of electronic information currently in their receipt or referenced by Defendants in their motion does not constitute <u>Brady</u> material.  Moreover, the government has always complied with the Court's Orders and made a good faith effort to conduct a thorough and complete search of both hard copy and electronic files to uncover all responsive materials.  And any alleged "gaps" in the electronic searches would likely only have yielded material cumulative to evidence already available to the defense.  For the above reasons, the defendants' motion has no basis and should be denied.

### A.     The Information Sought by the Defendants in Their Discovery Request is Not <u>Brady</u> Material

As a threshold matter, <u>Brady</u> requires the disclosure by the prosecution of exculpatory and impeachment evidence that is "both favorable to the accused and 'material either to guilt or to punishment.'" <u>United States v. Bagley</u>, 473 U.S. 667, 674 (quoting <u>Brady</u>, 373 U.S. at 87).  The government has an affirmative duty to search possible sources of exculpatory information and to make a "systematic response."  <u>United States v. Safavian</u>, 233 F.R.D. 12, 17-19 (D.D.C. 2005).  The government has fulfilled this duty, as well as the obligations set forth in the Court's April 27, 2007, Order.  <u>See</u> 2007 WL 1239204 at *2-3 ("Court expects the government to respond to this

7

Court's order by conducting thorough and complete searches of both hard copy files and electronic files, in a good faith effort to uncover all responsive information.").  The fact remains that the type of documents detailed by the defendants in their motion to dismiss is not <u>Brady</u> evidence.

## I.    The Referenced Materials Are Not Exculpatory

Evidence is exculpatory when it "would tend to show freedom from fault, guilt or blame." <u>See</u> <u>United States v. Blackley</u>, 986 F. Supp. 600 (D.D.C. 1997).  Defendants seem to argue that virtually every record relating to the expedited visa process is exculpatory because it negates certain elements of the bribery charges against them, that is, "the element of corrupt intent and the extent to which granting an expedited visa is an 'official act.'"  Defendant's Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss (June 6, 2008) (hereinafter "Def. Memorandum") at 30 [Docket No. 115].  But even assuming that all materials related to expedited visa appointments at the Toronto consulate demonstrate what the defendants maintain they do – for example, that virtually every applicant asking for an expedited appointment was granted one, that no formal or established policy regarding expedited visa appointments existed, or that foreign service nationals often granted expedited visa appointments to applicants as opposed to consular officers – the defendants' conduct is no less culpable.

The bribery statute,18 U.S.C. §§ 201(b)(1) and (2), criminalizes the following conduct:

> (1)    directly or indirectly, corruptly giv[ing], offer[ing] or promis[ing] anything of value to any public official . . . or offer[ing] or promis[ing] any public official . . . to give anything of value to any other person or entity, with intent . . . to influence any official act . . . .; [and]

> (2)    being a public official . . ., directly or indirectly, corruptly demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to

> receive or accept anything of value personally or for any other
> person or entity, in return for . . . being influenced in the
> performance of any official act . . . .

As set forth in the Superseding Indictment, from February 1, 2004, through the April, 2006,

twenty-two visa applications were submitted to the Toronto consulate on behalf of STS Jewels-

affiliated persons.  In many, if not all of these cases, Defendant Agrawal sent facsimiles

specifically addressed to Defendant O'Keefe asking for expedited treatment for these STS Jewels-

sponsored persons.  When Defendant Agrawal made such requests for expedited treatment,

Defendant O'Keefe routinely granted them and scheduled expedited appointments for these

individuals.  Moreover, Defendant O'Keefe personally handled these STS Jewels applicants and

issued twenty-one of these twenty-two visas.  In exchange, Defendant Agrawal provided

Defendant O'Keefe with trips to New York and Las Vegas, as well as jewelry and other items of

value.

In support of their contention that the electronic materials in question would be

exculpatory, Defendants state that these documents would support a finding that most everyone

who sought an expedited appointment at the Toronto consulate was granted one.  Even if this

proposition were borne out in the evidence,[7] Defendant Agrawal cannot claim that no crime was

---

[7]    Cf. Superseding Indictment at ¶ 11(11), (63) (quoting from a January 6, 2005, and April 3, 2006, e-mail, respectively, from Defendant O'Keefe to Defendant Agrawal):

> Sunil, Just to let you know **your fax came in yesterday while I was home ill and as a result was refused. I pulled the case today and approved it so your people should be getting a call today telling her she can have an expedited appointment**.  She can come in next week and I will see her.  Just have them tell my secretary, when she calls when she wants to come in.  **In the future just have someone call me and let me know that the fax is coming.  I will be interviewing her and I don't foresee any problems.**  Mike O'Keefe.  (Emphasis added).

committed simply because he foolishly paid for services he may have likely gotten for free or that others often received without resorting to bribery.  Nor can Defendant O'Keefe argue that it was legal to take money for workplace actions he may have legitimately taken absent any inducement. The D.C. Circuit held in United States v. Orenuga, 430 F.3d 1158, 1166 (D.C. Cir. 2005) that "it is not a defense to the crime of bribery that had there been no bribe, the public official might have lawfully and properly performed the same act."[8]

Moreover, "[a]n act is done 'corruptly' under this bribery statute if it is performed voluntarily and deliberately and performed with the purpose of either accomplishing an unlawful end or unlawful result or of accomplishing some otherwise lawful end or lawful result by any unlawful method or means."  O'MALLEY, GRENIG, AND LEE, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 27.09 (2007).  Thus, even if requests for expedited interviews would most likely have been granted to the STS Jewels applicants or that their visas would have been issued by another consular official or were otherwise approvable, the fact that Defendant Agrawal paid bribes to Defendant O'Keefe and that Defendant O'Keefe accepted bribes for scheduling

---

\*\*\*

> Sunil, Please let me know if everything is set up for the visa appointments are all set for your people.   As I mentioned in a separate e-mail, the request was originally denied by my boss because he felt that appointments for five people was too much.  I explained that I knew you and the company and that you had a good reason for the request.  He then told me that it was my decision so I approved the appointments.  If there is still a problem, I'll take care of it, but let me know.  Mike O'Keefe.

[8]     See also United States v. Jannotti, 673 F.2d 578, 601 (3d Cir. 1982), quoting United States v. Labovitz, 251 F.2d 393, 394 (3d Cir. 1958) ("[I]t is neither material nor a defense to bribery that 'had there been no bribe, the (public official) might, on the available data, lawfully and properly have made the very recommendation that (the briber) wanted him to make.'"); United States v. Anderson, 509 F.2d 313 (D.C. Cir. 1974), cert. denied, 420 U.S. 991 (1975).

expedited interviews for and issuing visas to STS Jewels-sponsored persons supplies the "corrupt" intent.  See id. ("The motive to act 'corruptly' is ordinarily a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit to another.").  Nor is it a "defense to the crime of bribery . . . that the *[offer] [or] [promise] [demand] [or] [receipt]* of anything of value was made *[to] [by]* the public official to influence an official act which is actually lawful, desirable, or even beneficial to the public."  Id. at § 27.11.  Thus, documents described by Defendants would never negate the element of Defendants' corrupt intent.

Yet, Defendants continue to contend that documents from the Toronto consulate would demonstrate that there was no bribery because Defendant Agrawal received nothing of value in return for his lavish gifts to Defendant O'Keefe.  The defendants maintain that no *quid pro quo* existed due to the fact that the expedited visa appointment process is highly informal at the Toronto consulate, that virtually everyone who requested an expedited appointment received one, and thus, the STS Jewels-sponsored persons would have obtained expedited visa interviews regardless of the "friendship" between the defendants.  Notwithstanding the fact that there is no indication that Defendant Agrawal subscribed to the above understanding at the time of the charged conduct,[9] even if the Toronto consulate granted expedited appointment requests as a

---

[9]    On the contrary, evidence such as this excerpt of an August 25, 2005, e-mail from Defendant Agrawal to Defendant O'Keefe suggests otherwise:

> Mike, Hope all is well with you.  **I thank you for granting H-1 visa stamp to my manager - [P.K.S]** and his family.  **The waiting time in India for such stamp is very long right now.  This also saved him and his family the hassle of traveling all the way to India.  Looking at the long waiting time and the traveling expenses, would it be possible for you to issue H-1 stamps to couple of our managers more. . . .I will definitely look forward to see you at Jewelry show of Vegas next year.**  Best Regards Sunil Agrawal.

matter of course, there would still be value in knowing that your expedited visa appointment and visa issuance were guaranteed. Here, Defendant Agrawal provided trips and jewelry to Defendant O'Keefe in exchange for the certainty of having STS Jewels-affiliated individuals receive expedited visa appointments and for ensuring that their visas were ultimately issued in a timely manner.

Defendants also argue the absence of an "official act" because non-consular staff routinely granted expedited visa appointments. This argument similarly has no basis, and documents demonstrating that foreign service nationals employed at the Toronto consulate regularly made these decisions would not be exculpatory. The Department of State has the sole responsibility for issuing non-immigrant visas and therefore dictating the manner in which these visas are issued. Scheduling a visa appointment is one of a number of required steps in obtaining a visa.

It is clear that both the scheduling of an expedited visa appointment and the issuance of a visa are official acts, that is, "decision[s] or action[s] on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). The fact that non-consular officials and/or foreign service nationals at the Toronto consulate routinely handled the scheduling of expedited visa appointments does not render the granting of an expedited visa appointment any less of an official act within the meaning of the statute. Nowhere in the statute does it state that a public official

---

Superseding Indictment at ¶ 11(34). Moreover, it should be noted that the documents produced by the Toronto consulate to date illustrate that requests for expedited interviews were routinely denied.

must be the only person capable of or permitted to perform the official act in question.

It should also be noted that, under 18 U.S.C. § 201(a)(1), the term "public official" is defined, among other things, as "an officer or employee or person acting for or on behalf of the United States, . . . in any official function, under or by authority of any such department . . . ." Congress intended a broad interpretation of "public official," writing that the term encompasses officers and employees of the United States, as well as other individuals working on behalf of the United States. See S. Rep. No. 87-2213 (1962), at 5. Foreign service nationals and other staff employed at the Toronto consulate therefore fall under the definition of "public official[s]," which further weakens Defendants' position.

In short, the fact that expedited visa interviews were regularly granted or that visas were routinely issued at the Toronto consulate does not make the acts themselves any less official acts. Granting expedited visa interviews and issuing visas clearly constitute decisions or actions on matters brought before the Department of State. Consequently, whether or not the individuals sponsored by Defendant Agrawal would have been granted expedited visa appointments even without Defendant O'Keefe's involvement and whether non-consular officials often granted expedited appointment requests in Toronto are matters of no legal significance, and any documents reflecting this do not exonerate the defendants.

### ii.    The Referenced Materials are Not Impeachment Evidence

Defendants merely make a vague mention that the specified electronic documents would assist in the impeachment of government witnesses. However, how these materials could be used

as impeachment evidence is far from clear.[10]  The government can only surmise that the defense intends to question Department of State employees about the routine nature and frequency of approving expedited visa appointments and the lack of any established policies regarding expedited visa interview procedures.  These assumed lines of questioning fail to provide support for any type of <u>Brady</u> violation, though, as Defendants admit, they have whatever documents they need to formulate those questions.  <u>See</u> Def. Memorandum at 30 ("*Finally*, the evidence shows that the expedited visa process was not only an 'informal' one, but that virtually every person or company that requested an expedited business appointment received one.").  Further, the government has never contested that expedited visa interviews were routinely granted and that the decision to grant or deny an expedited visa interview or issue a visa was a discretionary one.  The government does not expect that any government witness will testify differently.

In addition, in light of the documents already produced by the Toronto consulate, it is difficult to see how these records would constitute proper impeachment material, much less admissible evidence at trial.  For instance, as illustrated by the documents contained in Exhibit 14 of Defendants' Memorandum, which was filed under seal, most of these materials consist of individual requests for expedited visa interviews.  How Defendants intend to confront witnesses with these types of documents is unclear.  Nonetheless, to the extent that they wish to engage in this exercise, and are allowed to do so by the Court, the already produced material from the

---

[10]     The only specific reference to witness impeachment consists of a somewhat convoluted contention that Ms. Petrovich, Visa Unit Chief of the Toronto consulate, "might have been impeached (or at least embarrassed) by the documentary record" regarding "the theory of the Indictment that Mr. Agrawal bribed Mr. O'Keefe to violate existing procedures and grant the expedited appointments" in light of alleged evidence already produced showing that the visa process was both "informal" and that almost every applicant requesting an expedited visa appointment for business reasons was granted one.  <u>See</u> Def. Memorandum at 30.

Toronto consulate would provide them with more than adequate fodder.

Defendants have not demonstrated how they would use any documents from the Toronto consulate as impeachment evidence. Speculation about the potential likelihood of impeachment without any support is not an adequate foundation for a motion to dismiss. While Defendants are certainly not obliged to share their trial plan with the prosecution, neither can they demand further discovery based on "mere speculation" that so-called "destroyed" electronic documents would be useful during cross-examination. That approach has been rejected with regard to exculpatory evidence. See, e.g., United States v. Brooks, 966 F.2d 1500, 1504 (D.C. Cir. 1992) ("As the burden of the proposed [search] rises, clearly the likelihood of a pay-off must also rise before the government can be put to the effort." ); see also United States v. Navarro, 737 F.2d 625, 632 (7th Cir. 1984) (holding that "[m]ere speculation that a government file may contain Brady material" was not enough).

Presumably, the standard is not lower for impeachment evidence. Indeed, the Supreme Court indicated that the two types of Brady material should be treated alike. See United States v. Bagley, 473 U.S. at 676 ("The Court of Appeals treated impeachment evidence as constitutionally different from exculpatory evidence. . . . This Court has rejected any such distinction."). Hence, the mere prospect that the electronic documents would contain impeachment material is not sufficient to support Defendants' Brady claim.

### B.    The Defendants' Due Process Rights Have Not Been Violated by Any Alleged Failure to Preserve Electronic Evidence

The majority of Defendants' Memorandum consists of technical attacks on how electronic searches were conducted by staff at the Toronto consulate. In fact, Defendants have even engaged an expert witness to assist in critiquing the methodology of the searches. The

government will address the specifics of these allegations in Section I.C.ii. of this opposition. Nonetheless, even assuming arguendo that some responsive documents may not have been fully captured by electronic searches and may not have been preserved, Defendants' due process rights have not been violated.[11]

Whatever duty the Constitution imposes on the government to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the Defendants' defense.  See California v. Trombetta, 467 U.S. 479, 488 (1984).  To meet this standard of constitutional materiality, evidence must (1) possess an exculpatory value that was apparent before the evidence was destroyed, and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.  See id. at 488-89. The evidence alleged to have been destroyed in this case meets neither of these requirements.

First, Defendants can say no more about the "exculpatory value" of the allegedly destroyed documents than that they might have been exculpatory.  But this kind of speculation does not suffice to meet the standard of constitutionality described in Trombetta, 467 U.S. at 488-

---

[11]    One of the difficulties with Defendants' assertion that the government's alleged defects in production of electronic documents constitutes a Brady violation is that the standards for assessing such a violation are generally backward-looking and reserved for appellate review. Although the term "Brady violation" is sometimes used to refer to any failure to disclose exculpatory evidence, "strictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Strickler v. Greene, 527 U.S. 263, 281 (1999).  "Our cases make clear that '[t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt,' and that a State's failure to turn over (or preserve) potentially exculpatory evidence therefore 'must be evaluated in the context of the entire record.'" Arizona v. Youngblood, 488 U.S. at 60 (Stevens, J.) (concurring) (citing United States v. Agurs, 427 U.S. 97, 112 (1976)).  Because the Court cannot possibly say for certain whether the documents at issue were exculpatory, let alone that they would influence a jury verdict at trial, it is impossible to decide whether there has been a Brady violation at this time.

89, and Agurs, 427 U.S. at 109-10.  The Supreme Court further elaborated on this standard in

Arizona v. Youngblood, 488 U.S. 51.  There, the Court noted that the exculpatory value of a piece

of evidence must be clear before a due process violation may be found:

> *Trombetta* speaks to evidence whose exculpatory value is "apparent."  467 U.S. at
> 489.  The possibility that the [evidence] could have exculpated respondent if
> preserved or tested is not enough to satisfy the standard of constitutional
> materiality in *Trombetta.*  Second, we made clear in *Trombetta* that the
> exculpatory value of the evidence must be apparent " *before* the evidence was
> destroyed." *Ibid.* (emphasis added). Here, respondent has not shown that the police
> knew the [evidence] would have exculpated him . . . this evidence was simply an
> avenue of investigation that might have led in any number of directions.

Arizona v. Youngblood, 488 U.S. at 56 n.1.

The documents Defendants argue would have been produced if superior electronic

searches were conducted in this case are of a similar character.  No one can say that these

documents were certainly exculpatory, and there can only be speculation as to what such

documents may have been.  Under Trombetta, that fact alone separates this case from Brady and

its progeny.

Secondly, Defendants are even less able to meet the second prong of the test set out in

Trombetta.  They have failed to demonstrate that comparable evidence could not be obtained

through other means.  Indeed, Defendants cannot make this showing, as they already have the

precise type of evidence they continue to seek.  See Def. Memorandum at 30.  Generally, courts

are put into a difficult position when asked to determine the value of evidence no party has ever

seen.  Trombetta, 467 U.S. at 486 ("Whenever potentially exculpatory evidence is permanently

lost, courts face the treacherous task of divining the import of materials whose contents are

unknown and, very often, disputed.").  In this case, however, the Court can look to the evidence

already produced from the Toronto consulate and Defendants' descriptions of the materials they

seek to obtain.  Defendants' discovery requests provide insight into the type of documents they believe searches at the consulate will reveal, i.e., records relating to the expedited visa interview process.  Notably, Defendants have already obtained comparable evidence by other means – namely, the extensive document production already provided by the government.  They now possess a wealth of documents from the Toronto consulate regarding applicants requesting expedited interviews, denials or granting of expedited interviews, and the individuals responsible for making those decisions.  In addition, the government has offered to stipulate to the fact that consular officials exercise great discretion in granting or denying expedited visa appointments, that receiving an expedited visa appointment is a common occurrence, and that people frequently receive expedited visa appointments without providing anything of value to the interviewing official.

### C.      Defendants Cannot Meet The Arizona v. Youngblood Standard

As previously stated, Defendants at most can argue that electronic documents that potentially existed and are no longer available may have potentially been exculpatory.  Still, Defendants contend that their due process rights have even been violated under the standard enunciated by the Supreme Court in Arizona v. Youngblood.  Under that standard, Defendants must prove prosecutorial bad faith in possibly failing to preserve electronic documents that may have been responsive to the Court's April 27, 2007, Order.  See Arizona v. Youngblood, 488 U.S. at 57 ("We therefore hold that unless a criminal defendant can show bad faith. . . , failure to preserve potentially useful evidence does not constitute a denial of due process of law.").  This they cannot do.

Defendants first contend that the government failed to take steps to preserve material

electronic evidence with "potential exculpatory value" despite being on notice after Defendant

Agrawal made his initial Rule 16 discovery request on December 22, 2006.[12]  At the time of that

request – about three months after Defendants were initially arraigned – the government had no

basis for believing that every document referencing expedited visa appointments in any way from

the Toronto consulate (or any other posts) could be deemed as material or relevant, much less

seen as potentially exculpatory.  In light of the evidence amassed, the government viewed the

case as involving discrete transactions by Defendant O'Keefe – that is, the granting of expedited

interviews and issuing of visas to STS Jewels-sponsored persons for Defendant Agrawal.

Therefore, sending a preservation notice to all of the Toronto consulate employees was not

contemplated.

After the Court's April 27, 2007, Order, and in the rush of coordinating the physical and

electronic searches at the six embassies and consulates, as well as off-site locations, the

government and the Department of State failed to issue a preservation notice for all electronic

documents to the posts.  With the advantage of 20/20 hindsight, such an action would have been

more prudent.  Nonetheless, it should be noted that, prior to the dissemination of letters (along

with copies of the Court's April 27, 2007, Order) to the various posts, Defendants had an

opportunity to weigh in on the contents of the letters.  Defendants themselves failed to suggest

any such preservation notice to the posts at that time, or at any subsequent time, but now seek

dismissal of the indictment in this case on the grounds that the government exhibited bad faith by

failing to issue such a dictate.

---

[12]    Although Defendant's Memorandum states a date of December 22, 2007 (see Def's Memo. at 30), the government believes that Defendants instead intended to refer to December 22, 2006.

In further arguing that the government acted in bad faith, Defendants cite to the failure of the Department of State to preserve evidence under the Federal Records Act ("FRA"), which requires that the Department "preserve records containing adequate and proper documentation of the . . . policies, decisions, procedures . . . necessary to protect the legal and financial rights of . . . persons directly affected by the [Department's] activities."  44 U.S.C. § 3101.  Determinations as to what constitutes records necessitating preservation are left to the discretion of the respective agency.  See, e.g., General Records Schedule 23, Item 7, Transmittal No. 15 (August 2005); 5 FAM § 443.2.  As the document production has demonstrated, the majority of the electronic records produced have involved requests by visa applicants for expedited appointments.  Defendants' argument suggesting that the FRA requires proper preservation of all of these materials inevitably leads to the illogical conclusion that almost every single document created or received by a consulate or embassy would fall under the preservation requirements of the Act.

Defendants further argue that the government's "reluctant and recalcitrant behavior" supports a finding of bad faith.  See Def. Memorandum at 32.  This characterization is wholly inaccurate and not borne out by efforts undertaken by the government to comply with the April 27, 2007, Order, as demonstrated by the relatively quick time frame in which the government was able to produce to Defendants over 200,000 documents from six different consulates and embassies.  In addition, the government assisted Defendants by supplying original format data for electronic search results and by arranging telephone conferences with individuals involved in the search process.  These are not the actions of a party acting in bad faith.

As an illustration of the government's alleged "pattern of resistance to any discovery that is inconsistent with their views of the case [that] tends to support a finding of bad faith (Def.

20

Memorandum at 32 & n.15),” Defendants once again cite to the government’s actions regarding defense access to Canadian witnesses employed by the Toronto consulate.  In light of the seriousness of this contention, a more in-depth examination of the issue is necessary.[13]

During a March 22, 2007, motions hearing, defense counsel mentioned their need to have access to Canadian witnesses who worked at the Toronto consulate.  In an attempt to be of assistance, government counsel <u>sua</u> <u>sponte</u> offered to make contact with Canadian witnesses regarding the issue of defense witness interviews.[14]  On April 27, 2007, Defendant Agrawal’s counsel sent a letter requesting to interview five Canadian individuals.  On June 15, 2007, the government notified Defendant Agrawal’s counsel in writing about its efforts to facilitate these interviews.  The government outlined in writing for Defendants the means and method[15] in which Defendant Agrawal’s request was passed on to each of these individuals, as well as each of the individuals’ eventual declination of the request.

On July 28, 2007, the defendants filed a motion requesting a letter rogatory ordering the depositions of four named Canadian witnesses.  A hearing on the matter was held on September

---

[13]     The government memorialized the events surrounding these depositions in a February 28, 2008, letter to the defense which has been attached to this Memorandum (**Ex. 1**).

[14]     Contrary to the defendants’ assertion at page 4 of their Memorandum of Law in Support of Defendants’ Joint Motion for Leave to Take Foreign Discovery and for Issuance of a Letter Rogatory (hereinafter “Def. Memorandum in Support of Letter Rogatory”) [Docket No. 58], government counsel never “offered to set up interviews” with these Canadian witnesses.

[15]     Specifically, each of the Canadian witnesses “was informed that the decision to answer the questions or not was completely up to that person and that any decision they made was completely fine and that they would be supported in their decision by the Department of State either way.”  6/15/07 Ltr. From AUSA Johnson to T. Green (Def. Memorandum in Support of Letter Rogatory at Ex. 7).

12, 2007.[16]  Shortly thereafter, United States Magistrate Judge John M. Facciola issued an opinion granting the defendants' request.  On November 14, 2007, Judge Facciola issued a Memorandum Opinion and Order granting and modifying the defendants' letter rogatory request.   It was the government's understanding that upon Judge Facciola's issuance of this order, the defendants would immediately file their letters rogatory request with the Canadian courts through locally-retained Canadian counsel.  The government was therefore awaiting the issuance of an order by the Canadian courts and fully expected the scheduling of these depositions upon issuance of such an order.

On February 5, 2008, the government was forwarded a letter from Defendant Agrawal's Canadian counsel, dated Thursday, January 31, 2008, which was written to one of the Canadian witnesses, and indicated that Defendant Sunil Agrawal would seek to impose court costs upon the witness if she did not voluntarily consent to being deposed.  The letter stated, "If I do not hear from you by that time [4:00 p.m. on Friday, February 8th, 2008] that you will agree to attend an examination as described in the Letters Rogatory, we shall commence proceedings to compel your attendance at such an examination and look to you for the costs of such proceedings.").

Upon receipt of the letter, the government immediately contacted counsel for Defendant Agrawal, who confirmed that Defendant Agrawal had purposely chosen to wait and had therefore never filed the letters rogatory with the Canadian courts up to the present time.  Defendant Agrawal stated that defendants were now seeking to expedite the process and bypass a time-

---

[16]     At the hearing, government counsel offered to pursue the option of coordinating with the Department of State to make the Canadian citizens available at trial.  Counsel for Defendant Agrawal stated, "If the Government wanted to compromise this issue, they should have compromised it before they put me through the cost and burden of filing this motion . . . . [W]e're going to stand by our motion."  9/12/07 Hr'g Tr. at 40-41 (**Ex. 2**).

consuming and costly court process by having the witnesses voluntarily consent to have their depositions taken.

A number of issues arose in regards to the Canadian lawyer's letter, including, but not limited to, the permissibility of assessing court fees to a witness in this situation in Canada and representation of the Toronto consulate employees. In an attempt to resolve this situation, the government consulted with Department of State legal counsel, as well as the U.S. Department of Justice Office of Foreign Litigation. Those offices raised a host of additional legal issues upon reviewing the letter rogatory and Canadian counsel's letter, including significant impediments to conducting the depositions in Canada (for instance, the inability of the Canadian courts to order the provision of U.S. embassy archival records and testimony regarding these records).

In order to avoid engaging in protracted negotiations and/or legal proceedings, and in light of Defendant Agrawal's professed desire to have these depositions occur as soon as possible, upon discussion with Department of State legal counsel and the Office of Foreign Litigation, in February 2008, the government therefore suggested holding the depositions in the United States. And yet, Defendants continue to label the government's actions regarding the depositions of these Canadian citizens as bad faith.

Lastly, Defendants maintain that misrepresentations were made to the Court about the electronic searches conducted at the Toronto consulate, further illustrating the government's level of bad faith. See Def. Memorandum at 32-33. As the record has shown, the government has made every effort to clarify for Defendants and the Court the scope and methodology of the electronic searches. The efforts of the government and the Department of State during the discovery process can hardly be characterized as "narrow or parsimonious" compliance with the

Court's Orders.  See April 27, 2007, Order, 2007 WL 1239204 at *2-3.  Indeed, the government and Department of State officials and consular staff involved in the search efforts have invested an enormous amount of time and resources in attempting to abide by the Court's Orders and to provide responsive documents and information as quickly as possible.  The government has been in near-constant contact with the consulates, attempting to coordinate a thorough and complete response to Defendants' discovery requests.  The consulates, in turn, have made every effort to comply with these requests as quickly and thoroughly as possible.  As stated previously, staff at the Toronto consulate initially spent more than 160 hours conducting searches and preparing copies of materials in response to the Court's April 27, 2007, Order.  Department of State employees in Washington, D.C. have also labored to produce the requested information, which included an exhaustive search of archived consulate materials at off-site storage facilities at the Kentucky Consular Center ("KCC") and the National Archives and Records Administration.  Over 70 hours were spent searching these off-site storage materials.  See Gov't. Opp. to Motion to Compel (Oct. 26, 2007) at 8 [Docket No. 78 ].

> **I.    Government's Response to Defendants'
> Allegations Regarding the Electronic Searches**

Defendants contend that there are seven "irremediable" problems with the government's electronic searches at the Toronto consulate that warrant dismissal of the indictment.  See Def. Memorandum at 18.  These claims, addressed more fully below, are either factually inaccurate or unreasonable in scope.  In any event, no claim presented in Defendants' Memorandum warrants such an action by the Court.

> **a.    Search of Shared E-mail Mailboxes**

Defendants' assertion that "the government produced no documents from any . . . shared

mailboxes" is incorrect.  In fact, the government produced a great many e-mails sent to and received from the shared mailboxes.  These were provided to the defense in electronic format on September 20, 2007.[17]

Defendants rely on a telephone conversation with John Long in which Mr. Long stated that he did not search the shared mailboxes, for the conclusion that no such e-mails were produced.  In fact, the shared mailboxes were searched by Ms. Petrovich and her staff.  In a supplemental declaration, Ms. Petrovich explicitly states that she personally searched the shared mailboxes and that most responsive e-mails were located in the shared mailboxes developed for the expedited appointment process like the "Toronto, Consular" mailbox.  Declaration of Peggy L. Petrovich (June 19, 2008) (hereinafter "Petrovich 3rd Decl.") at ¶ 9 (**Ex. 4**).  Indeed, the presence of shared mailbox e-mails in the discovery production corroborates her assertion.

### b.    Search of Stand-Alone Documents

Defendants contend that "the government has never produced a single stand-alone electronic document that was retrieved through an electronic search."  Def. Memorandum at 19.  For this, the defense relies on the statements of Brett Harrison, a defense-retained computer search expert who was wholly unconnected with the Toronto consulate search.  In fact, Ms.

---

[17]    For instance, Bates-numbered documents TOR_0015961–62; 0015977, 0015979–87, included in the electronic discovery CD-ROM, are examples of e-mails from the Toronto, NIV Employment mailbox.  Furthermore, a brief perusal of the documents contained on that disc reveal e-mails to and from the following shared mailboxes: Toronto Consular NIV (TOR_0016105); Toronto Consular (TOR_0016120); TRT, NIV Expedited Apt (TOR_0016024); Evisa, Toronto (TOR_0016111–14); and Gold, Toronto (TOR_0016200–5).  A copy of these documents will be filed under seal with the Court (**Ex. 3**).

Petrovich conducted both manual and electronic searches for stand-alone documents.[18]

Moreover, whether the documents were retrieved manually, or electronically through the use of

search terms, is of little significance.  Defendants do not (and cannot) claim with any certainty

that a manual search would necessarily be less thorough or complete.

In any event, the search method did not prevent the defense from obtaining stand-alone

documents.  The government has already noted that responsive stand-alone documents were

produced to the defendant in hard copy format.  See Govt. Opp. to Mot. to Compel, Docket No.

75, at 5-6 ("[T]he consulate provided hard copies of all responsive electronic stand-alone

documents relating to expedited appointments."); see also Petrovich 3rd Decl. at ¶ 6.  Since older

versions of the Standard Operating Procedures ("SOPs") and the expedited appointment calendar

existed only in hard copy, the Toronto consulate sought to make their production more uniform

by providing hard copies of the other stand-alone documents as well.  As discussed in the

February 20, 2008, Order, this is a perfectly permissible methodology.  537 F. Supp.2d at 23

("[I]f, as occurred here, electronically-stored information is demanded but the request does not

specify a form of production, the responding party must produce the electronically-stored

information in the form in which it is ordinarily maintained *or in a reasonably usable form or*

*forms*." (emphasis added)).

---

[18]     These searches were performed using both Microsoft Outlook (for emails) and
the Microsoft "My Computer" search program (for other documents).  The asterisks included in
her previous declarations were only intended to indicate that she performed separate searches for
each derivation of that root word.  For instance, the search term "expedite*" meant that she also
searched for "expedited,""expedites," etc.  See Petrovich 3rd Decl. at ¶ 7.

### c.    Search of Hard Drives

Defendants contend that the Toronto consulate did not search any hard drives, shared drives or personal drives.  Def. Memorandum at 20.  Again, this contention is based upon defense counsel's telephone conversation with John Long.  However, as Ms. Petrovich's declaration makes clear, the search Mr. Long conducted was not the only one performed at the consulate.  In her third declaration, Ms. Petrovich stated that she and her staff searched both hard drives and shared drives.  See Petrovich 3rd Decl. at ¶ 4.  As with the stand-alone documents, responsive documents located on the hard drives of the relevant employee computers were provided in hard copy.

Mr. Long searched the personal drives of some of the individuals connected to the expedited visa process.  See Declaration of John Long (July 3, 2008) (hereinafter "Long Decl.") (**Ex. 5**).  Though Defendants attempt to cast doubt on this fact by stating that he "awkwardly changed his story" during their telephone call, Mr. Long clearly described the locations he searched.  Mr. Long refutes Defendants' characterization of his previous statements as being awkward or unsure.  Id. at ¶ 7.  Any responsive documents located on the personal drives were produced in electronic format, on the September 20, 2007, CD-ROM.

Defendants further argue that the footers on certain produced documents somehow indicate that other responsive documents were not produced.  This contention is nonsensical. Neither the government nor the Toronto consulate dispute that other documents existed on the "P" or "W" drives.  However, it stands to reason that not every document on a computer hard drive is related to expedited visa appointments.  Such documents are obviously outside the scope of the Court's April 27, 2007, Order and were not included in the production for that reason.

### d.    Search of Email Attachments

Defendants assert that they received no e-mail attachments in the government's discovery productions.  They point to the Toronto consulate's current instructions for expedited visa requests – that applicants send both their e-mail requests and certain attached information to a shared mailbox, trtniv@state.gov – to demonstrate that many responsive documents may have been located in the consulate's shared mailboxes.  Defendants lament the possibility that such documents have been lost or destroyed.  This concern is unwarranted.  The shared mailbox Defendants refer to was not created until June 2007.  <u>See</u> Petrovich 3rd Decl. at ¶ 10.  To the extent that applications were e-mailed to mailboxes created earlier, <u>i.e.</u>, Toronto, Employment NIV, those attachments were assumed to be relevant, and all were produced in discovery.[19]

### e.    Adequacy of Search Terms

Defendants similarly claim that the keyword searches designed by the Toronto consulate were "insufficient, unreliable, and at a variance with Ms. Petrovich's declaration."  Def. Memorandum at 21.  The Court declined in its April 27, 2007, Order to micromanage the electronic search process.  As the Court indicated in its February 20, 2008, Order, "for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread."  537 F.

---

[19]    Many of the documents included in the electronic discovery CD-ROM appear to be attachments to expedited appointment requests retrieved from shared mailboxes. For instance, scans of passports and other travel information were very likely attached to the request itself. Indeed, it would be very peculiar to send a photo or a flier as the only content of an e-mail. Also, since stand-alone documents (which might otherwise look similar to an e-mail attachment) were produced in hard copy rather than on CD-ROM, it is unlikely that the documents included in the electronic production are anything other than e-mail attachments.

Supp.2d at 24.  It is highly speculative to suggest that other terms would have been more efficient. More keywords can always be added, of course, but the avalanche of obviously irrelevant materials that such a step would produce would be unmanageable.  The D.C. Circuit has held that prosecutors must make the effort to "turn over an easily turned rock," but, presumably, they need not move a mountain.  See Brooks, 966 F.2d at 1503.

In fact, Ms. Petrovich did use the terms stated in her previous declaration when she performed her own electronic searches. The fact that parts of the search were performed manually does not necessarily make it less thorough.  Indeed, a manual search may allow for more careful examination for potential responsiveness.

Mr. Long also performed a search with the terms Gilbert Furtado provided him.  See Long Decl. at ¶ 2.  However, that search produced an inordinate number of unresponsive emails.  Id. at ¶ 4.  To narrow the results, Mr. Long used the following search phrases:  "early appointment," "early interview," "expedite appointment," and "expedite interview."  Id. at ¶ 4.[20]  Even this more limited search produced a large number of unresponsive documents.  Mr. Long spent additional time examining the search results and separating relevant from irrelevant "hits."  All responsive emails located through Mr. Long's electronic email search were included in the electronic discovery CD-ROM.

---

[20]     Mr. Long has also indicated that the narrower search terms would still have "hit" upon derivations of each word.  For instance, a search for "expedite appointment" would have turned up documents containing the words "expedited appointment" and other variations.  See Long Decl. at ¶ 5,  Thus, the scope of the search was not as restricted as Defendants imply in their Memorandum.

**f.      Search of Former Employees' E-mail**

Mr. Long was able to search .pst files for e-mails of recently departed former employees. This search included e-mails from three individuals  – Michael Schimmel, Michael O'Keefe, Robert Thomas, and Donald Steele.  Long Decl. at ¶ 6.  Any responsive emails were included in the electronic discovery production.   As employees departed from post, they would no longer have access to the post's network.  For a short period of time, e-mails from these individuals may have remained on the post's computer systems.  Unless an employee specifically requested to transfer existing electronic documents, this action was not automatically taken.

**g.      Electronic Search Toronto Consulate Personnel**

Defendants argue that the government utilized the superior search capabilities of the Department of State's CIF (Computer Investigations and Forensics Branch) unit for their case-in-chief evidence, but elected not to do so in the later searches.  The electronic searches completed in response to the Court's April 27, 2007, Order were conducted by on-site consulate and embassy personnel, while the search of Defendant O'Keefe's computer was conducted by the CIF.  Defendants unreasonably assume that this change is an attempt by the Toronto consulate to avoid Department of State scrutiny of its practices.  In reality, the searches were conducted differently for a more practical, less conspiratorial reason.  That is, it was deemed that deploying CIF support out to all six embassies and consulates to conduct electronic searches on-site was impractical and overly burdensome in light of the scope of the searches and ongoing responsibilities of the unit.  Thus, the Department of State tasked staff at each of the respective posts with the responsibility for conducting electronic searches consistent with the Court's April 27, 2007, Order.

Nonetheless, Defendants persist in their assertion that the production of electronic documents from the Toronto consulate are "highly suspect." However, "vague notions that there should have been more than what was produced are speculative and an insufficient premise for judicial action." February 20, 2008, Order, 537 F. Supp. 2d at 22; see also Hubbard v. Potter, 247 F.R.D. 27, 30-31 (D.D.C. 2008). In any event, Defendants have not been prejudiced in any manner.

### h.  Defendants Have All The Information Necessary to Support Their Defenses

Defendants claim that alleged "gaps" in discovery have restricted their ability to prepare their defense. Defendants' motions and other filings have already set forth their defenses against the bribery charges – that there was no "official act" or "corrupt intent." To support these claims, Defendants maintain that they need evidence indicating that expedited visa appointments are commonly granted, that non-consular staff were also responsible for granting expedited interviews, and that the Toronto consulate would likely have granted the STS Jewels-sponsored persons with expedited visa appointments without inducement. Defendants already possess this information. It is unlikely that any number of additional documents will serve them better than the over 200,000 documents already in their possession.

The best indication that the government has sufficiently performed it discovery obligations is the admission by the defense that they have the evidence they need to support their defenses. As referenced earlier, in their Memorandum, Defendants state that the available evidence proves their central point. See Def. Memorandum at 30.

**D.      Any Failure to Preserve Electronic Data Is Not Grounds for
Dismissal of the Indictment**

Dismissal of an indictment is an extreme remedy that is not to be taken lightly.[21]  This is

even more so here, where the parties are still in a pre-trial status.  Nonetheless, Defendants

contend that dismissal is warranted.   At most, what Defendants have alleged is that electronic

documents responsive to the Court's April 27, 2007, Order, may not have been preserved.  There

is no indication that such a failure, if it occurred, was negligent, much less, intentional, on the part

of the government.[22]  The Supreme Court has held that, "absent demonstrable prejudice, or

substantial threat thereof, dismissal of the indictment is plainly inappropriate, **even though the**

**violation may have been deliberate**."  Morrison, 449 U.S. at 365.

Importantly, the type of electronic documents, such as expedited visa applications, at the

Toronto consulate are cumulative in nature, and their admissibility is questionable.  Moreover,

Defendants are already in possession of a large amount of similar materials.  Thus, even if the

electronic searches conducted by the Toronto consulate neglected to uncover and preserve

responsive materials, Defendants are in no way prejudiced by this alleged shortcoming.

However, even if the Court were to find that the government in some way failed to

adequately preserve materials, the dismissal of the indictment in the case is an inappropriate

remedy.  In Miller v. Holzman, 2007 WL 172327 (D.D.C. 2007), a case cited by Defendants, the

---

[21]      Notably, many of the cases cited by Defendants in their Memorandum involved
courts finding that dismissal of the indictment was inappropriate.  See, e.g., United States v.
Morrison, 449 U.S. 361 (1981); United States v. Marshall, 132 F.3d 63 (D.C. Cir. 1998); United
States v. Hastings, 126 F.3d 310 (4th Cir. 1997).

[22]      See U.S. v. Chapman, 524 F.3d 1073, 1085 (9th Cir. 2007) (stating that accidental
or merely negligent governmental conduct is insufficient to establish flagrant misbehavior
warranting dismissal of an indictment).

D.C. Circuit found that the government failed to comply with a litigation hold and such a failure was unreasonable.  As a result, several kinds of documents were destroyed and thus were irretrievable.   The Court nonetheless denied the defendants' motions to dismiss, stating that "[i]t hardly follows…that this case should be dismissed.  To the precise contrary,…it is the law of this Circuit that a case may not be dismissed as a sanction for the loss of evidence until all lesser alternatives have been explored and have been found either futile or ineffective to cure the prejudice caused the defendants and the court's docket."  Id. at *7.  The Court further found that the government's failures were "at worst negligent and certainly do not rise to the level of egregious misconduct that would justify dismissal based solely on the need to deter others from similar conduct." Id.   The Miller Court similarly found that only after "the court has heard trial testimony" can it determine whether the loss of evidence is "so significant that dismissal is warranted." Id.  To order dismissal pre-trial, the Court said, would be "improvident and an obvious violation of the unequivocal commands of Bonds [v. District of Columbia, 93 F.3d 801 (D.C. Cir. 1996)] and Webb [v. District of Columbia, 146 F.3d 964 (D.C. Cir. 1998)] to invoke the sanction of dismissal without considering the efficacy of alternatives on the best possible record…." Id.

Furthermore, in Shea v. Donohoe Construction Company, 795 F.2d 1071 (D.C. Cir.1986), a civil case, the D.C. Circuit gave three basic reasons to support a default judgment or dismissal as a sanction for misconduct:

> Our past decisions reveal three basic justifications for dismissing an action because of counsel's misconduct. First, dismissal is necessary at times because the other party in the case has been so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case. Second, dismissal may be appropriate where resort to any less drastic sanctions would not mitigate the severe

> burden that the misconduct has placed on the judicial system.
> Finally, dismissal may, on certain occasions, serve as an ultimate
> sanction, aimed at punishing abuses of the system and deterring
> future misconduct.

Defendants have failed to demonstrate any prejudice to their case by the alleged failure to preserve electronic evidence that would warrant dismissal.  Nor have Defendants provided any justification why any lesser drastic sanction would suffice.

## III.  CONCLUSION

The type of electronic information that Defendants allege the government improperly failed to preserve, assuming it even existed at all, does not constitute <u>Brady</u> material.  In light of the fact that the government has always complied with the Court's Orders and made a good faith effort to conduct a thorough and complete search of electronic files to uncover all responsive materials, dismissal of the indictment in this case is clearly inappropriate.  Defendants' failure to articulate any due process violations mandates that their motion should be denied.

WHEREFORE, for the foregoing reasons, the United States respectfully requests that the defendant's motion to dismiss be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar Number 498610

By:

_____/s/_____
BRENDA J. JOHNSON
DC Bar Number 370-737
(202) 353-4154
Brenda.Johnson@usdoj.gov
DENISE CHEUNG
DC Bar Number 451714
(202) 307-2845
Denise.Cheung@usdoj.gov
Assistant United States Attorneys
National Security Section
555 4th Street, N.W. – 11th Floor
Washington, D.C.  20530